LEYSON, Administrator, Appellant, *v.* DAVIS et al.,
Respondents.

[Submitted September 24, 1895.  Decided November 25, 1895.]

GIFT—*Donatio causa mortis—Evidence of donor's intent.*—In an action by an administrator to recover bank stock claimed by the defendant under a *donatio causa mortis* from decedent, it appeared that the plaintiff's intestate, a man of advanced years and in failing health had, prior to leaving on a journey for his health, been engaged in adjusting his business affairs, and on the eve of his departure, having summoned his nephew and a friend to his room, in the presence of the latter, after carefully verifying the number of the shares, handed his nephew the certificates of stock, representing his entire holding in the bank, saying, "I have always intended that for you, you take that," and in reply to words of encouragement as to his health from his nephew and friend, said, "The train may jump the track and kill me. If I don't come back, or anything happens, I want you to have that. I am an old man and there is no telling. I don't think I can get over this disease. I can't stand it. I am too old—I can't expect it. I only hope it will be so, but I don't think it." The decedent returned from the journey but died from the disease from which he apprehended death at the time of the gift. It also appeared that during the year of the gift, he had told different friends of his intention to give "the bank" to his nephew and that he never intended it to go into his estate. *Held,* that there was a valid gift *causa mortis.*

SAME—*Same—Delivery—National bank stock—Equity.*—Stock in a National Bank may be the subject of a valid gift *causa mortis,* though the several certificates representing the stock were delivered without endorsement or assignment in writing, and without transfer on the books of the bank as required by its by-laws, and the laws of the United States, and though each certificate was on its face transferable only "on the books of the bank, on the surrender of this certificate." By such delivery the equitable title to the stock passed to the donee and equity will afford him the means of obtaining the incorporeal subject of gift,—the stock itself, by decreeing the transfer of the legal title.

SAME—*Same—Dominion of donor—Bank stock—Evidence.*—A gift *causa mortis* of bank stock, otherwise valid, will not be defeated because of the fact that the donee at a stockholder's meeting, shortly after the gift, used a proxy which had been signed in blank by the donor a few days prior to the gift of the stock, by inscribing the name of his brother, who voted the stock in the donor's name, it also appearing that after the gift the donor was never at the bank or took any part in its management or affairs; that the donor controlled the proxy, and that the stock was voted as he directed. And in an action by the donor's administrator against the donee and the bank to require a transfer of the stock to him, the person who voted the stock may be permitted to testify that the donee controlled and directed him in voting it.

NEW TRIAL—*Newly discovered evidence.*—A new trial will not be granted on the ground of newly discovered evidence based upon an affidavit stating that a witness who had testified on the trial to a certain conversation, had admitted to affiant that his testimony was false, when there is nothing to show that the witness would testify differently on another trial, and there is, otherwise, abundant evidence to sustain the judgment, and no probability that the result would be different.

*Appeal from Second Judicial District, Silver Bow County.*

ACTION by an administrator to require the transfer to him of bank stock standing in the name of the intestate. The cause

was tried before MCHATTON, J. Defendants had judgment below. Affirmed.

Statement of the case by the justice delivering the opinion.

The appellant, as special administrator of the estate of Andrew J. Davis, deceased, sued to recover 950 shares of the capital stock of defendant bank, alleged by him to belong to the estate of the said deceased, and claimed by said defendant Andrew J. Davis, Jr., under a *donatio causa mortis.*

The material allegations of the complaint are: Appellant was and is the duly-qualified and acting administrator of said estate. That the defendant was and is a national bank duly organized and existing under the laws of the United States, and that said decedent at the time of his death was the owner of said 950 shares of the capital stock of the said defendant bank, which he had never indorsed, transferred, conveyed, or otherwise disposed of, and that said shares of stock at the time of the death of said decedent stood, and still stand, upon the books of said bank, in his name, and that each of said certificates of stock contains the following provisions: "Transferable only by him or his attorney on the books of this bank, on the surrender of this certificate." That, prior to the commencement of this action, appellant presented to the officers of said bank a duly-certified copy of his letters of administration, and demanded that said stock be transferred to him, as such administrator, upon the books of said bank, which was refused. That the said defendant Andrew J. Davis, Jr., was and is the cashier and one of the directors of said bank, has possession of said certificates of stock, and claims some right or title thereto, or interest therein. That his claim thereto has no foundation in law or equity. That he refuses to surrender or deliver up said shares of stock, although demand has been made, and that said claim and possession of said certificates of stock casts a cloud upon appellant's title as such administrator, and prevents him from obtaining a transfer of said stock upon the books of said bank. It also alleges that

the entire capital stock of said bank consists of 1,000 shares, and that said bank is an established institution, with a large and increasing business.

The prayer is that the claim of said defendant Andrew J. Davis, Jr., be declared void; that he be compelled to deliver up said certificates of stock; and that defendant bank be required to transfer the same upon its books, and issue new certificates therefor to this appellant as such administrator.

To this complaint the defendants made separate answers. The said defendant Andrew J. Davis, Jr., denies that said shares of stock, or any of them, or the certificates representing the same, or any thereof, were or are the property of said decedent, left by him at the time of his death; denies that said decedent was the owner of the whole or any of said stock or certificates, or that he never transferred, conveyed, or otherwise disposed of the same; and avers that said defendant is the owner and in possession of said shares of stock and the certificates thereof, and was such owner and in possession at the time of the death of said decedent. He denies that his claim to the said shares of stock and the certificates thereof is without merit or foundation in law or equity, or that his claim to said stock, or possession of said certificates, casts any cloud upon appellant's title, or that he ever had or has any title thereto. He admits that he is, and for several years last past has been, cashier of said defendant bank; but denies that he now is, or has been at any time since the death of said decedent, a director thereof. The answer, for affirmative matter, substantially avers that said defendant Andrew J. Davis, Jr., is a nephew of said decedent; was cashier of said bank for several years before decedent's death, and for some time before said death he had managed and attended to all the business of said bank; that in the latter part of the month of December, 1889, said decedent was, and had been for some months, seriously and dangerously ill, and suffering from the disease and ailment of which he afterwards died; that he was then about 70 years of age, and preparing to travel to the Pacific coast for his health; that on the 27th or 28th day of December, 1889, at

Butte City, in the county of Silver Bow and state of Montana, said decedent, being seriously and dangerously ill, and suffering from the disease and ailment of which he afterwards died, but being of sound and disposing mind, and in view and apprehension and expectation of his death, gave to said defendant as a gift the shares of stock and certificates thereof described in the complaint, and at the same time delivered said certificates of stock to defendant as a gift, and that defendant then and there received and accepted the same, and that thereafter, on the 11th day of March, 1890, said decedent died of said disease and ailment of which he was suffering at the time he made said gift and the delivery of said stock and certificates thereof to defendant, and he has ever since said gift and delivery held in his possession, claimed as his own, said shares of stock and the certificates thereof, and now so holds and claims the same, and is entitled to have said stock transferred upon the books of defendant bank, but that said bank and the directors refused, and still refuse, to permit said transfer to be made until the rights of said parties to said stock and shares are determined by the court. The prayer is that said defendant Andrew J. Davis, Jr., be adjudged the owner of said stock and certificates thereof; that said appellant, as such administrator, and said estate, have no right or interest therein; and that said defendant bank be required to make the proper transfers upon its books.

The separate answer of defendant bank, in substance, says that it has no interest in the controversy; that it has heretofore refused, and now refuses, to make any transfers of said stock upon its books, although requested by appellant and said Andrew J. Davis, Jr., to do so; and that it is ready to make such transfers, or whatever else the court may order it to do in the premises.

To the separate answer of the said defendant Andrew J. Davis, Jr., appellant filed his replication, which is substantially as follows: He denies the serious or dangerous illness of the said decedent, or that he died from any disease or ailment of which he was suffering at the time of the alleged gift, or in

December, 1889, or that on account thereof the decedent was preparing to travel to the Pacific coast for his health; denies that on the 27th or 28th day of December, 1889, at Butte City, Montana, or at any other time or place, said decedent ever made the gift of said shares of stock, or certificates thereof, to said defendant Andrew J. Davis, Jr., or that he ever accepted or received the same, or held or retained possession thereof under any such gift, or that said decedent was of sound and disposing mind at the time of the alleged making of the same, or that he died on account of the disease or ailment of which he was suffering at the time of the alleged making thereof; and avers that the facts set forth in his complaint are true, and asks judgment according to the prayer of the same.

The case was tried to the court sitting without a jury. Upon the trial the following facts were adduced:

A. J. Davis, designated by counsel and witnesses throughout this case, as Judge Davis, a resident of Butte, in this state and for many years prior to his death president of the First National Bank of that city, died March 11, 1890, leaving an estate, exclusive of 950 shares of the capital stock of said bank, now involved in this controversy, and other valuable assets, appraised in value at $2,489,393. By accumulated profits and enhanced value during the 12 or 15 years of the bank's existence, for nearly all of which time the deceased actively and personally controlled the bank's affairs, the value of this stock when this action was begun was admitted to be $950,000. In the latter part of the year 1889 Judge Davis was in somewhat feeble health, and close to 70 years old. He had not been in perfect health for some time, and had on divers occasions told plaintiff herein, who was a close and old friend, that he was too old to recover from his ailment. It appeared, too, that he had been for some time trying to straighten up his affairs, and fix up everything in the bank. In November of that year he joined Judge Hiram Knowles and Hon. W. W. Dixon in a trip to Tacoma and Victoria. While away he was very nervous, worrying over money affairs, was quite feeble and ill much of the time, suffering from insomnia and pain, and often

took medicine. After one particularly bad night of suffering, Judge Davis wanted to return to Butte at once. So about December 1st the party came home, having been gone scarcely three weeks. Judge Davis' health declined. He was no better a day or two after his return than before he went to Puget Sound. The insomnia continued, and the habit of taking medicine every day or two was kept up. But his mind was perfectly clear, although he seems not to have resumed any activity in business generally, except to adjust some important and unfinished transactions, extending over seven or eight years, with this plaintiff, Talbott. The nature of this business was an accounting in mining matters in which Talbott and Judge Davis were jointly interested. It was Talbott's habit to go to the judge's room at night, and to proceed with the adjustment. The "figuring" connected with the settlement was done by Andrew J. Davis, Jr., principal defendant in this suit. The settlement included many items of account, and occupied three or four hours of every evening, commencing about December 19th, and continuing until about the 27th, when Judge Davis executed a deed to Talbott, and thus finally concluded their business affairs. If the deceased showed fatigue occasionally, as he did, during the settlement, the matter was continued until the next evening. When all was about wound up, and upon the evening before the deed to Talbott was executed,—say December 27th,—the judge said to Andrew J. Davis, (who was always called Andy, and whom we will likewise, for convenience, call Andy), "When you come down to-morrow, fetch my box down," and at the same time he told Talbott to come too.

Certain other material testimony appropriately finds place at this point: Judge Davis was a bachelor living with a private family in Butte. He is described by certain witnesses as a very close man, sagacious, careful and correct in business affairs; and by Judge Knowles, United States district judge for Montana, decedent's successor as president of the bank (a very confidential and intimate friend, and for a long time his counsel), as a man of few friendships,—a remarkably reticent

and secretive man about himself and his affairs.    But he spoke freely and often of his nephew and namesake, Andy.    Not one, but numerous witnesses, several nonresidents, and other prominent citizens of the state, testified to voluntary statements made by the decedent, that Andy was a good business man, was coming out all right, and would some day own the bank.    For instance, to one friend he stated in the summer of 1889, that he "never intended the bank to go into his estate, that he always intended that for Andy, and that was what he expected to do with it."    To another friend, in July, 1889, he said, "I intend to make another trip to Europe, and before I go I intend to give the bank to Andy," and afterwards said to the same friend that he wanted to call in all of his outside business, and that he had intended to give the bank to Andy. To another, that it was his intention to give the bank to Andy, in due course of time.    And again, in speaking of a new bank building which was being erected in the summer of 1889, the decedent remarked, "As the bank belongs to Andy, you will put in a set of rooms, bathroom and everything complete." To others he remarked that the bank would be Andy's.    To still another friend and former employe, in speaking of business generally, he said the bank was "Andy's, and he considered it Andy's, and wanted it so considered;    *    *    *    that he was not giving him much,—a hundred thousand dollars, and what it earned."    To an old business acquaintance he said in 1888 that "he hoped that Andy's sickness (at the time Andy was sick, and at some springs away from Butte) would not amount to anything, because he wanted him to be well before taking charge of the bank, because he intended to give him the bank, and wanted him to be a healthy man."    To a national bank examiner, in August, 1889, when it was suggested that the responsibilities of being cashier of the bank were great for Andy, the decedent replied, "That will be all right, as Andy will some day get the bank anyway."    And afterwards, in October, 1889, he repeated this conversation, saying that Andy should have it all when he was gone.    To a banking friend from Omaha, whom he met in November on the steam-

boat going to Victoria, he said his health was very poor, and that he had started to take a trip to Japan, hoping to be improved by the sea voyage, but that he did not know whether he would be able to continue or not, as he was feeling very poorly; that he had built up the bank in Butte by his own personal efforts, and had made it the best bank in Montana, and had a great deal of pride in it, and had trained his nephew Andy to the business, so that he could take sole charge of the bank after his death, and when he got home he expected to give over control of the bank to him, and intended to give the stock of the bank owned by him to Andy, and that it was his intention that Andy should eventually be the manager of the bank; and that he would leave his stock in said bank to him. To the physician of Andy, likewise an old friend of decedent's, when told that Andy's constitution was not strong enough to enable him to work in the bank from morning until night, he remarked, "Andy knows very well that that bank will belong to him some day." To another friend, who had had charge of his business in Butte for a number of years, he related the history of Andy's coming to Montana, and said that before Andy had come he had consulted Mr. Story, of the *Chicago Times*, about the boy, Andy; that Story had spoken well of him; that frequently, from the year 1884 up to nearly the time of his death, Judge Davis had spoken about Andy, said that he was getting along nicely, and that he wanted the bank to remain in the Davis family, and in the Davis name, and under Davis management, even after his death, and that he expected the bank to fall to Andy when he died.

The decedent had brought Andy to Montana when a boy, years before, and put him to work in the bank, where the young man's industry and business capacity had so impressed themselves upon his uncle that he made him the cashier about 1887. The evidence is that he loved his nephew Andy, and regarded him as a father would a son. "He was the only person," said Judge Knowles, "that I ever knew Judge Davis to exhibit any particular warmth or affection towards." He was solicitous of Andy's health. When he was sick he watched

him, consulted physicians about him, and he "seemed to feel differently towards Andy than to any one else that was around him."

But to resume the interview at the decedent's room on the night the box was brought down : Talbott, the plaintiff herein, was there in obedience to the judge's request. Andy came in later. Judge Davis soon came up from downstairs, and joined them. Talbott was the only witness who could testify to the facts constituting the alleged gift. Talbott was a friend of the deceased and of Andy. He had been intimately acquainted in business, and other ways of life, with Judge Davis, for eighteen or twenty years; was an officer of the bank before and after decedent's death, and interested more or less in certain business ventures in which Andy was interested. This is Talbott's account :· The three sat about a little table or desk in the middle of the room. Upon this desk were pen and ink. The decedent had the key and unlocked the box,—an ordinary black tin box. He pulled the papers out altogether, and put them on the table. He looked around for a while, and finally said : "Where is all of this ? This isn't all. There is something that is not here." "It appeared," said Talbott, "that he got them all pulled out together, and did not get them all." Andy said that he guessed they were all there, and, after figuring the number of bank-stock certificates, he told his uncle they were all there. "Well, now," said the judge, "there is fifty shares in the directors' hands." Thereupon he enumerated the directors, and it appeared as if one (Hauser) had never executed any paper to show how he held the stock evidently standing in his (Hauser's) name. The judge then told Andy to write to Hauser, and see that he signed a contract, and to do it right away. Both the judge and Andy found the stock all right then, and the 950 shares were accounted for in several (4) certificates. Andy, after counting the stock up, and showing his uncle what there was of it, passed the certificates over to Judge Davis.· The judge took them, and passed them back to Andy, saying, "I have always intended that for you; you take that," or, as the

witness said, in response to another question by his counsel, asking him what Judge Davis said, "I have always intended that for you, and I want you to take it." Andy took the stock, and put it in his pocket. The witness Talbott described his feelings as follows : "Well, Andy took it, and I sat there, and it was a kind of a surprise to me. I didn't expect anything of that kind. I didn't know what he did. I supposed he had his business, or maybe would fix his business, in a different way; but he did that, and he said, 'I always intended to do that, and now I will do it.'" Talbott and Andy then commenced talking to Judge Davis, and telling him that they did not think he was so ill as he might think. To this the decedent replied : "Well, I am an old man, and there is no telling. I can't stand what I used to stand. I don't think I can get over this disease. I can't stand it. I am too old. I can't expect it." The witness Talbott, when asked what Judge Davis said in reference to his expectation of recovery or not, answered that the judge said : "You might think it, but I don't. I only hope it will be so, but I don't think it." Thereupon Andy and Talbott told him that they thought he would recover if he would go down there (meaning the Puget Sound country), and give his business up, and not be bothered about it, but the judge said he "didn't think it;" he was "going to try it, any way." "I will get ready, and go in the morning," said Judge Davis. The interview seems then to have terminated.

The certificates of stock had no written or printed assignments indorsed upon them, of any kind. The delivery was unaccompanied by any writing at the time. Andy took the box away with him to the bank, the four certificates of stock being in his pocket at the time they left Judge Davis' rooms. Upon the next day, in company with John A. Davis, his brother, the decedent left Butte for Tacoma, in the state of Washington.

On January 14, 1890, a trifle over a fortnight after the judge had gone west, the annual meeting of the stockholders of the bank was held. The minutes of the meeting show that

at that meeting John E. Davis, a brother of the defendant, under a proxy signed by Judge Davis, represented and voted the stock in question, and Judge Davis was one of the directors, and president, chosen at that meeting. The proxy bears date December 24, 1889. It therefore antedates the interview just detailed as of December 27 or 28, 1889. The proxy is in the usual form, giving authority, "for me and in my name, to vote 950 shares of the stock of the First National Bank of Butte, owned by me, and standing in my name on the books of said bank, at the annual meeting of the stockholders thereof to be held for the election of directors on the 14th day of January, A. D. 1890, pursuant to law." John E. Davis testified that he voted the stock at that meeting under the proxy for Judge Davis for president; that the proxy was given to him by Andy at the bank, at the meeting of the stockholders; it was the first time he had ever seen it. The witness said that the body of the proxy was in the handwriting of Andy. As the witness' name was inserted in a different ink, the proxy was probably in blank when signed. Witness said that he had never had any conversation with Judge Davis in regard to this proxy, or any direction from him as to what officers and directors he should vote for under it; that he voted the way Andy told him, and after he voted he handed the proxy back to Andy. Judge Davis continued to be president of the bank until his death. So far as the testimony shows, he had no knowledge of said election of himself as president, or of his holding said position, and never did any act as president of said bank from the time he handed the certificates to Andy.

In the early part of February, 1890, Judge Davis returned from his second trip to the west coast. He failed considerably in health during his absence. He talked very low to those whom he met upon his arrival and was feeble and very ill. Judge Knowles and Andy went with him to his room that night. He said to Judge Knowles, "I want to see you tomorrow." The next day Judge Knowles called. He found Judge Davis' physical condition bad. Continuing, Judge Knowles said: "He had lost ground since I had seen him.

* * * At this time when he went up to Tacoma, and some time before that, he was all the time trying to straighten up his affairs, as he claimed, and fix up everything in the bank. He would go into the bank, and take out the bills payable to the bank, and look over them and examine them all, and those he did not think were just right he wanted them fixed up. He wanted everything fixed up, he said. That was before he went to Tacoma, and afterwards. He did not state to me for what reason he wanted them fixed up. You must remember that Judge Davis was a remarkably reticent and secretive man about himself and his affairs. He was a very good talker about other people's affairs, but he was a very secretive man about his own affairs and about himself. * * * Well, he was accustomed to talk along the last about Andy, as he always called him,—his business capacity, and in a very characteristic way. He would pump me as to my opinion about him, and then he would compare him to himself. He would say, 'Now, I was just a little fellow, just like Andy, and he will come out all right.' * * * As to his affection, I think that Andy is the only person that I ever knew Judge Davis to exhibit any particular warmth of affection towards. He was a man that had few friendships, and Andy was one of his particular favorites. If he was sick, he was always uneasy. He was sick in the bank here once. He had a room in the bank, and the judge would go in and look at him, and he would not say anything particular to him, but he would rush right off and see the doctor, and ask him about what he thought of Andy, and ask if he was very sick, or something of that kind; and he seemed to feel differently towards Andy than to any one else that was around him. * * * Judge Davis was quite sick, and I had gone in there and talked with him about his trip and his health, and he said, 'I wish to make some presents.' He went on and stated that he wanted to know if I thought he was sound enough in mind to make these presents, and he had a long talk about any probability about his going insane, and I went on and discussed with him what I had read upon these subjects of insanity and brain diseases. The

conversation was probably an hour long, and in this conversation about the presents he first said that he wished to give ten thousand dollars to the Public Library of Butte. Andy wanted him to, and he understood that Charlie Larabie had given ten thousand dollars, and he wanted to give ten thousand dollars to meet that. Then he said there was a lady here whose husband had helped him considerably, and he wanted to make her a present, though he said he had paid him for everything he had done that he asked, but he wanted to make her a present. He said something about W. E. Wehrspaun's little girl, but exactly what was said about that I don't remember. Then he said there were two persons in the states that he wanted to make presents to, and in this conversation he said, 'Andy is to have the bank,' or 'control the bank.' I don't know which now, or he might have said both. That was all that was said particularly about Andy in that conversation. That is as far as that matter is concerned. The balance of it led up to a legal matter. The interview was to be renewed. He was not to attend to any business, or go up to the bank, or anything of that kind; and in three days from that time I was to be there, and we would straighten up his affairs.'' This question was then asked Judge Knowles: ''In this conversation with reference to Andy, did he say that he wanted to give the bank to Andy?'' Judge Knowles' answer was: ''He did not. He said, 'Andy is to control the bank,' or 'to have the bank;' and I think he may have said both, because this conversation was fully an hour long, and I don't know but more.''

On the cross-examination of Judge Knowles the following testimony was given: ''Q. This conversation that you refer to, in which he spoke of giving Mrs. Wehrspaun's daughter something, and also to the library ten thousand dollars, and also something to the lady here, and also that Andy was to have the bank, or to control the bank, was after his return from Tacoma, was it? A. The last time; yes. It was his last trip to Tacoma. Q. I believe you say that it was understood that you were to return within a few days, and fix up these matters for him? A. No; it was not to fix up these

gifts, exactly.    The return was with a view of writing a will, and fixing everything in that way.'' On his redirect examination, Judge Knowles continued as follows: ''My object for returning then was to draw a will.    That was the legal matter that came up.    The other matter was my opinion as to his physical condition and capacity to make these presents that he was going to make.''    Thereupon the judge of the court asked Judge Knowles whether the statements made by Judge Davis to him concerning Andy and the bank were in the course of professional employment by Judge Davis.  Judge Knowles replied that he did not consider it a professional matter, but a personal one, and that Judge Davis' consultation in relation to these gifts was in a friendly way.    Judge Knowles states that he was anxious that Judge Davis should fix up his matters by a will at that time, and the conversation led finally up to that proposition; but Judge Davis did not ask Judge Knowles about a will, or making any will, but he spoke to him about making these presents, and whether he (Judge Knowles) thought that he (the decedent) was mentally capable of making these gifts. At the expiration of three days, Judge Knowles called again.    He found Judge Davis insane.    His reason never returned to him, and he died of his ailment on March 11th thereafter.

Shortly after Judge Davis died, about April 19, 1890, on a hearing in reference to the inventory, or concerning the amount of property to come into his hands as special administrator of the estate of the deceased, the plaintiff herein, Talbott, was a witness.    At that hearing Talbott, among other things, not material to be reiterated, testified substantially that Judge Davis gave Andy the stock; that the decedent looked the stock over, and gave it to Andy, and said he did not know whether he would ever come back or not,—there might be an accident on the railroad; that he (Talbott) and Andy told decedent they thought he would come back, and assured him that he would live ten or fifteen years; that decedent had said the train might jump the track and kill him, and, ''if I don't come back, or anything happens, I want you to have that.''    Upon the trial of this case Talbott was cross-examined concerning

his former testimony: "Q. Is that your language? (As used on the former trial.) A. Well, that is about the sum and substance of it,—that he wanted him to have the stock." Talbott further said upon this trial, upon cross-examination, that at the former hearing he had detailed, he thought, about what transpired, and that he had testified that Judge Davis was going to the coast, saying he was going down to see if it would not do him good again; it was the best place he had found in all his travels. He said that, if he detailed anything different upon the trial of this cause from what he had said upon the first hearing, "it cannot be much different, because it is all in the same meaning,—the same idea. I cannot see where it would make any difference, particularly. I gave the language as near as I could,—to the best of my knowledge and judgment." On redirect examination, the witness was asked whether, on the former examination, he had stated everything. He replied: "No, sir; I didn't state everything. Q. Have you, upon this examination, stated everything that occurred, as well as you could remember? A. I think so; everything that would be connected with the case. There were little things came up there,—talking about different things,—but nothing about that gift or anything. Q. You stated in your former examination, as read to you, that Judge Davis said that something might happen to him,—the train might run off the track. How did he come to make that remark? A. The reason was that we told him, you know, that we didn't think,—tried to brace him up and make him think that he was not so bad off, you know; and then it was that he said the train might jump the track, and he get killed in that way. He said, 'You are taking chances all the time when you are on a train,' or something to that effect. That was how that came about." The witness then said that he had testified upon the first hearing without knowing that he was to be called upon, and without having given any particular thought to the matter. Thereupon this question was put to him by respondent's counsel: "If there is any difference in the statement that you gave in your testimony before and that you have given now, which

would you say is correct? A. Well, I think that the statement I gave to-day is as near correct as I could give it, then or any other time. I don't see how I could better it any. There might be a word here and there that would mean a little different; but at the same time it all means the same to me, when I come to put it all together." Here was the recross-examination: "Q. There may be, you say,—have been,— some things transpired that you did not testify to on the former trial; but what facts you did testify to on the former trial are correct, are they not,—the facts? A. Well, I should say that they were; yes, sir. Q. While you might not have remembered some things that you testify to now, what you did testify to then is correct? Yes, sir."

The by-laws of the bank are made part of the case. So far as material, they provide that the regular annual meetings of the stockholders for the election of directors should be held on the second Tuesday in January of each year. The directors-elect were required to meet for organization, upon notification given by the cashier, within one week from the time of their election, and should do no business whatever prior to qualifying by taking the oath of office, as required by law. The president was to hold his office for the current year, and was to be elected by the board of directors. By-laws Nos. 21, 22 and 23 provide as follows: "(21) The stock of this bank shall be assignable and transferable only on the books of this bank, subject to the restrictions and provisions of the banking laws, and transfer book shall be provided, in which all assignments and transfers of stock shall be made. No transfer of stock shall be made without the consent of the board of directors, by any stockholder who shall be liable, either as principal, debtor or otherwise. (22) Transfers of stock shall not be suspended preparatory to the declaration of dividends, and, unless an agreement to the contrary shall be expressed in the assignments, dividends shall be paid to the stockholders in whose name the stock stands at the date of the declaration of the dividends. (23) Certificates of stock, signed by the president and cashier, shall be issued to stockholders, and the cer-

tificates shall state upon the face thereof that the stock is transferable only on the books of the bank.''

It also appears that on December 9, 1889, the regular meeting of the stockholders was called to be held at the office of the bank on Tuesday, January 14, 1890. This call was signed by Andrew J. Davis, Jr., respondent herein, as cashier. Pursuant to this call a meeting was held, as the following extract of the minutes will show : '' Present : Andrew J. Davis, by proxy to J. E. Davis, Hiram Knowles and A. J. Davis, Jr. On motion, Hiram Knowles was chosen chairman, and Andrew J. Davis, Jr., secretary. On motion duly carried, it was resolved to proceed to the election of directors, and Hiram Knowles and John E. Davis were chosen judges of the election, who announced the following directors duly elected, receiving nine hundred and seventy votes each : Andrew J. Davis, Hiram Knowles, S. T. Hauser, W. W. Dixon, James A. Talbott, A. J. Davis, Jr. The meeting then adjourned. Andrew J. Davis, Jr., secretary. Attest : Hiram Knowles, Chairman.''

W. C. Darnold, a witness for the defendant, testified that he was well acquainted with the decedent, having been in his employ for three years; that, after the return of Judge Davis from Tacoma the last time, he was out of employment, and, being unfriendly to Andy, he called upon Judge Davis himself, to solicit his friendly offices to obtain a situation, somewhere between the 1st and the 6th of February, 1890, and that Judge Davis then told him that he had given the bank stock to Andy, and had not any control over it, and that he could not do anything, but that when he got up he would help him; that at that time Judge Davis was very low, could only speak two or three words, and would keep quiet for a moment or two, and then speak again. Upon cross-examination Darnold said that nobody was paying him to remain in Butte, or to testify as he did; that he was out of employment at the time, and was living with Mr. J. R. Boyce, Jr.; that he had never mentioned to Mr. or Mrs. Boyce what he had heard Judge Davis say, and he had no recollection of having made any state-

ment to the Boyces that his testimony in this case would be a
"clincher." J. R. Boyce, Jr., referred to in the testimony
of Darnold, was called on the part of the plaintiff, and testi-
fied in substance that Darnold was working for J. R. Boyce,
Jr. & Co., as a bookkeeper, until about the 1st of March,
1890; that he had heard Darnold say that Judge Davis said in
1887 that he intended the bank for Andy; that about two
weeks before the trial of this case he heard Darnold say that
he would testify herein, and would be the last witness; and
that, although he did not state what he was going to testify to,
yet he had given the witness to understand that all he (Darn-
old) knew about the case was what Judge Davis had told him
in 1887. Mr. Boyce did not produce any books to verify his
statement, that Darnold left his employ about March 1, 1890,
and his testimony concerning that point was from recollection,
although the books were at Boyce's house at the time of the
trial.

The court found the issues in favor of the defendant Andrew
J. Davis, Jr., and rendered a decree in accordance with the
prayer of his answer, adjudging him to be the owner of all the
shares of stock described in the complaint, and the certificates
thereof, and entitled to have the same transferred to him on
the books of the bank; directing the First National Bank of
Butte, defendant, to make such transfer, and to issue to said
Andrew J. Davis new and proper certificates therefor.

A motion for new trial was made, based upon assigned
errors in admitting evidence of decedent's estimate of Andy's
business qualifications, and in admitting the testimony of John
E. Davis that Andy directed him to cast the 950 shares of
stock for the alleged donee for director, for the purpose of
showing the exercise of dominion and control over the stock
by Andy in the absence, and without the knowledge, of the de-
cedent. Nearly all the other errors assigned are involved in
the legal propositions discussed in the opinion. One ground,
however, of motion for new trial, was newly discovered evi-
dence. J. R. Boyce, Jr., who had been a witness, made an
affidavit to the effect that Darnold had stated to him on or

about July 1, 1894, that he had never had a conversation with Judge Davis on the subject of Andy's becoming the owner of the bank since 1886 or thereabouts, and that the conversation which Darnold had testified to as having occurred in February, 1890, was not true; that on July 11, 1894, Darnold asked the witness to go with him to see Mr. Stapleton, and that there, in the presence of Mr. Stapleton, Darnold said that his former statements on the trial of this case were not true. One John H. Curtis also filed an affidavit to the effect that about July 10, 1894, he had heard Darnold make a statement to Boyce that he (Darnold) had made a demand upon Mr. Davis for $10,000, which would enable him to go into business in Ohio, and that if Davis did not give it he intended to go to the attorneys and tell them that he misrepresented his statements on the witness stand.

As counter affidavits, the respondent Andrew J. Davis filed the statements of W. I. Lippincott, Guy X. Piatt, and himself. · It appears by these statements that there was a controversy pending between the bank and J. R. Boyce, Jr., in which Boyce claimed that Judge Davis, deceased, was a partner in business with him, and attributed a suit which had been brought by the bank against the firm of Jas. R. Boyce, Jr. & Co. to the enmity of respondent Davis. Respondent Davis himself stated in his affidavit: That he had caused an attachment to be levied in behalf of the bank on the stock and merchandise of said J. R. Boyce, Jr. & Co., and from that time Boyce had entertained unfriendly feelings towards him. That, since the trial of this suit in the district court, Boyce had solicited him to join in a scheme to buy up the claims against the firm of Boyce & Co., jointly with him, and together they would prove that A. J. Davis, the deceased, had been a partner in business with Boyce, and thus the amounts of said claims could be collected. Davis refused to enter into this arrangement. That on Friday, July 20, 1894, Boyce told Davis that he had evidence in his (Boyce's) pocket that would "upset his case;" that the other side wanted said evidence, but he would not let them have it if he (Davis) would agree to

go in with him to buy up the claims of the creditors of said Boyce & Co., and then hold the Davis estate for them. That Boyce gave him until noon of the next day to decide what to do, giving him to understand that, if he did not go into the arrangement he proposed, he would use the evidence which he claimed to have against him. That upon the next day respondent Davis told him he would have nothing to do with the arrangement he proposed. Darnold himself filed no counter affidavit.

It is unnecessary to recapitulate more fully the terms of the several affidavits used on motion for new trial. An affidavit of Mr. Wellcome was filed too late to be considered. The motion for new trial was overruled, and from the order overruling the same, and from the judgment, the plaintiff appeals.

*Toole & Wallace, W. F. Sanders,* and *McConnell, Clayberg & Gunn,* for Appellant.

Brief of *Toole & Wallace,* for Appellant.

I. As to the nature of a *donatio causa mortis,* its origin and early definitions, see: Sandar's Institutes of Justinian, p. 147; Swinburne on Wills, p. 22. The second definition given by Swinburne, "When the giver being moved with imminent danger, doth so give that straightway it is made his to whom it is given," in the light of the decision in *Basket* v. *Hassell,* 107 U. S. 602, must be taken as the correct one, inasmuch as it is decided there that a gift *mortis causa* is made upon conditions subsequent, and, not upon conditions precedent. See, also, *Comer* v. *Comer,* 120 Ill. 420; *Michener* v. *Dale,* 23 Penn. 59. The earlier decisions and the later ones also, look with a certain disfavor upon this class of gifts, and recommend that they be closely scrutinized before being allowed. (*Jones* v. *Selby,* decided in 1710, and reported in Finch's Precedents 300; *Raymond* v. *Sellick,* 10 Conn. 480-485; *Grymes* v. *Hone,* 49 N. Y. 17; *Headley* v. *Kirby,* 18 Penn. 326; *Walsh* v. *Sexton,* 55 Barb. 251; 125 N. Y. 172; 10 Am. St. Rep. 255; 3 Redfield on Wills 344, 348 and 349.)

II. As to the consequence of a failure to indorse or assign the *certificates of stock* and transfer the *stock* upon the books of the bank at common law and under the American decisions. The state of Montana has adopted the common law of England, declaring that it shall be the law and shall be considered of full force until repealed by legislative authority. (Sec. 201, 5th Div. Compiled Statutes.) We start then with the common law as applied to gifts *causa mortis*, as the law of this state, without change or modification by any "special enactment." It would seem that we ought to go no further than to inquire what the common law is on this subject. In *Ward* v. *Turner*, 2 Ves. Sr. 431, an attempt to give South Sea annuities by a mere delivery of the receipt for them issued by the company, was held invalid as a gift. In *West* v. *West*, 9 Ir. L. Rep. 121, there was a gift by deed without transfer on the books. The court declined to proceed until the donee had compelled the company to transfer the stock. (Thornton on Gifts, 351-345.) This rule requiring a transfer on the books of the company to make a gift perfect applies to a gift of railway stock. (*Moore* v. *Moore*, 18 L. R. 474; 33 L. J. Ch. 617; 22 W. R. 729; 30 L. T. N. S. 752.) That it applies to bank stock, see *Dillon* v. *Coppin*, 4 Myl. & Craig 647; 9 L. J. Ch. N. S. 87; 4 Jur. 27. As to American decisions: Schuler on Personal Property (Ed. 1876), pp. 160-161, says: "In view of the requirements of a transfer on the books of a company the courts of England and some parts of this country are disinclined to sustain gifts of stock upon a mere delivery of the certificate to the donee without pursuing the other legal formalities of a transfer." (*Moore* v. *Moore*, Law Rep. 18 Eq. 474; *Pennington* v. *Gittings*, 2 Gill & J. 208.) Nor according to the latest New Jersey decisions can there be a valid gift *causa mortis* of stock privileges. (*Egerton* v. *Egerton*, 17 N. J. Eq. 419.) But in New York a looser rule prevails and where an assignment was made in writing the court ordered the donor's executor to cause a transfer of the stock to be made. (*Grimes* v. *Hone*, 49 N. Y. 17.) The case was preceded by *Walsh* v. *Sexton*, 55 Barb. 251, which is

nearer this case, inasmuch as there was no endorsement on the certificates. The gift was upheld, but the court in deciding said: I concur in the view expressed by the court in *Brown* v. *Brown* (18 Conn. 410) against both the *principle* and *policy* of sustaining such a gift, but the authorities are the other way. (*Conroy* v. *Powers*, 70 N. Y. 212; *Beaver* v. *Beaver*, 117 N. Y. 411, 429; *Michener* v. *Dale*, 23 Penn. 59.) The Maryland cases subsequent to *Pennington* v. *Gittings*, of *Conser* v. *Slowden*, 39 Am. Rep. 368 (1880), and *Baltimore Retort and Fire Brick Co.* v. *Mali*, 57 Am. Rep. 304 (1885), continue the doctrine as laid down in *Ward* v. *Turner* (2 Ves. 431). The case of *Hall* v. *Howard's Adm'r*, 33 Am. Dec. 115, shows the theory of the courts of South Carolina as to the necessity of a complete delivery and passing of title fully to the donee. In Maine there must be as complete a delivery as the nature of the property will admit of. (*Hatch* v. *Atkinson*, 96 Am. Dec. 464.) The question is still open in Massachusetts. (*Morse* v. *Weston*, 152 Mass. 5; 24 N. E. 916;) *McWillie* v. *Van Vacker*, 72 Am. Dec. 127, a Mississippi case, was of a gift *inter vivos*, but the general run of authorities admit that so far as delivery is concerned the gifts are identical. (3 Pomeroy's Eq. Jur. § 1149 n. 3; 1 Tex. 161; 28 W. Va. 340; 73 Ala. 412; *Pennington* v. *Gittings*, 2 G. & J. 208; 45 Mo. App. 160; Thornton on Gifts, § 134; *Basket* v. *Hassell*, 107 U. S. 602.) "To constitute a valid gift *inter vivos* there must be a delivery of the thing, *actual* or *constructive.*" (*Love* v. *Francis*, 63 Mich. 181; 6 Am. St. Rep. 290.) "It must be a delivery as a gift, and such a delivery, as in case of a gift *inter vivos*, would invest the donee with the title to the *subject* of the gift." (*McCord* v. *McCord*, 46 Am. Rep. 9, Mo.) So far as delivery is concerned gifts *mortis causa* and those *inter vivos* are identical. (*Flanders v. Blandy*, 45 Ohio St. 108.) This being so, those authorities holding that as regards gifts *mortis causa*, an incomplete delivery will be finished by the courts as against the donor's representative are illy reasoned, as for example, *Grimes* v. *Hone*, 49 N. Y. 17. The only case to be found on this subject admitting the valid-

ity of such gifts, are the New York and Connecticut decisions. In *Appeal of Walsh*, 9 Am. St. Rep. 83, a Pennsylvania case, the court say: "In every valid gift a present title must vest in the donee, irrevocable in the ordinary case of a gift *inter vivos*, revocable only upon the recovery of the donor in gifts *mortis causa.*" See, also: *Estate of Smith*, 27 Am. St. Rep. 641; *Commonwealth* v. *Compton*, 137 Pa. St. 138. Again, the subject matter of the alleged gift here was stock in a national bank. Now, although the federal decisions construe the clause in the U. S. Statutes, concerning the transfer of stock, as being solely for the protection of the bank, yet they hold before the stockholder of a national bank is discharged of his liability as such, the transfer must be made on the books of the bank, to the transferree, or the assigned certificate left, together with a power of attorney. (121 U. S. 58.) Such being the case, the legal title is clearly in the transferrer until these things are done. The English cases uniformly hold, and in accordance with the *character* and *origin* of gifts *mortis causa*, that stock is not delivered unless transferred on the corporation's books. The earliest case is that of *Ward* v. *Turner*, 2 Ves. Sr. 431. It is followed by *Dillon* v. *Coppin*, 4 Myl. and Craig. 647; *Moore* v. *Moore*, L. & R. Eq. 474; 53 L. T. Rep. (N. S.) 5; *Gason* v. *Rich*, 19 L. R. Ir. 391; *Lambert* v. *Overton*, 13 W. R. 227; *Weale* v. *Oliver*, 17 Beavan 252; *Beech* v. *Keep*, 18 Beavan 285. The three last mentioned refer particularly to bank stock.

III. It is clearly apparent from the evidence that there was an intention on decedent's part to provide for Andy, but only after his (the decedent's) death. The fact that he did not endorse or assign the certificates, and left them standing in his name, clearly showed an intention to retain control and dominion over them while he lived, as this was the effect of it. It was an expression of what he would do in future, not a transaction completed at the time, and his conversation with Judge Knowles therefore shows that he so regarded it. Granting it was more; for example, as an intended gift, it was not to take effect until his death. In other words, everything was to

rest until he failed to return from his trip to Tacoma, or until he passed away, before being finally consummated. With this view of the transaction, which is fairly deducible from the evidence, the authorities to be cited show beyond question that it was not sufficient to make it a valid gift. It was a testamentary disposition, made in a nuncupative form, lacking the statutory requisites of such dispositions, and clearly invalid. (*Basket* v. *Hassell*, 107 U. S. 602; Thornton on Gifts, page 105; *Trenholm* v. *Morgan*, 28 S. C. 268; *Gammon Theological Sem.* v. *Robbins*, 128 Ind. 85; *Mutt* v. *Morse*, 142 Mass. 1; *Bradley* v. *Hunt*, 23 Am. Dec. 599; *Hall* v. *Howard's Admin.*, 9 Am. Dec. 115; *McDowell* v. *Murdock*, 9 Am. Dec. 684; *Waller* v. *Ford*, 74 Mo. 195; *McCord* v. *McCord*, 64 Am. Rep. 9; *Pope* v. *Burlington Savings Bank*, 48 Am. Rep. 781; *Walker* v. *Crews*, 73 Ala. 412; citing *Kinnebrew* v. *Kinnebrew*, 35 Ala. 628, and cases cited therein; 37 Ala. 289, and Perry on Trusts, §§ 96, 97 and 98; *Burton* v. *Bridgeport Savings Bank*, 52 Am. Rep. 602; *Newton* v. *Snyder*, 51 Am. Rep. 587; *Rogers* v. *Rogers*, 53 Wis. 36; *Love* v. *Francis*, 6 Am. St. Rep. 290; *Flanders* v. *Blandy*, 45 Ohio St. 108; *In re Campbell's Estate*, 47 Am. Dec. 503; *Appeal of Walsh*, 9 Am. St. Rep. 83; *Linsenbigler* v. *Gourlay*, 56 Pa. St. 166; *Michener* v. *Dale*, 23 Pa. 59; *Smith* v. *Ferguson*, 90 Ind. 229; *Conroy* v. *Powers*, 70 N. Y. 212; *Daniel* v. *Smith*, 75 Cal. 548; *Sterling* v. *Wilkinson*, 83 Va. 791; *Hatch* v. *Atkinson*, 96 Am. Dec. 464.) As to the distinction between the certificates and stock, the subject of the gift and the necessity of possession, dominion and control of the subject of the gift, being complete, which Andy asks for in this suit, see : (*Ridden* v. *Thrall*, 125 N. Y. 172; note to *Drew* v. *Hagerty*, 14 Am. St. Rep. 257; *Dunbar* v. *Dunbar*, 6 Am. St. Rep. 166; *Algers* v. *End. Sav. Bank*, 4 Am. St. Rep. 331; *Appeal of Waynesburg College,* 56 Am. Rep. 252; *Doyle* v. *Lincoln*, 31 Me. 428; *Sheegog* v. *Perkins*, 4 Baxter 273; *Crawford's Appeal*, 61 Pa. St. 52; *Sterling* v. *Wilkinson*, 83 Va. 791; *Barnes* v. *The People,* 25 Ill. App. 136; *Martin* v. *Funk*, 75 N. Y. 134; *Gano* v. *Fisk*, 43 Ohio St. 462; *Goulding* v. *Hanbury.* 35 Am. St. Rep. 351; *Barnum* v. *Reed*, 136 Ill. 388.)

IV.   While the right to vote the stock and hold office on account of it, are the principal elements that characterize the dominion and control over it, the actual exercise of that control, especially with the consent or direction of the alleged donee, is utterly inconsistent with a valid *donatio causa mortis* under all the authorities.   The donor shall not only divest himself of all such right, but it must be vested in the donee and not exercised by the donor after the gift.   (*Dunbar* v. *Dunbar*, 6 Am. St. Rep. 166; *Pope* v. *Burlington Sav. Bank*, 48 Am. Rep. 781; *Coleman* v. *Parker*, 114 Mass. 30; *Bunn* v. *Markham*, 7 Taunt. 224; *Hawkins* v. *Blewitt*, 2 Esp. 663; *Forquharson* v. *Cave*, 2 Col. 356; Thornton on Gifts, 110, 111, 112, 133, 134, 135, 140; note to *Drew* v. *Hagerty*, 14 Am. St. Rep. 257; *Dunbar* v. *Dunbar*, 6 Am. St. Rep. 257; *Alger* v. *N. End Sav. Bank*, 4 Am. St. Rep. 166; *Sheegog* v. *Perkins*, 4 Baxter 273; *Sterling* v. *Wilkinson*, 83 Va. 791; *Barnes* v. *The People*, 25 Ill. App. 136; *Goulding* v. *Hanbury*, 35 Am. St. Rep. 357; *Barnum* v. *Reed*, 146 Ill. 388.) " In order to constitute a gift *causa mortis* of a savings bank book of deposit, the book must be actually delivered to the donee with intent to consummate the gift, otherwise it will not operate as such gift." (*Tillinghast* v. *Wheaton*, 8 Rhode Island 536, 94 Am. Dec. 126; *Hope* v. *Burlington Sav. Bank*, 56 Vt. 284, 48 Am. Rep. 781; *Newton* v. *Snyder*, 44 Ark. 42, 51 Am. Rep. 587; *Burton* v. *Savings Bank*, 52 Conn. 398, 52 Am. Rep. 602; *Curtis* v. *Savings Bank*, 77 Me. 151, 52 Am. Rep. 750.) " To constitute such a gift the delivery must be complete and retained by the donee, until the donor's death." (*Dunbar* v. *Dunbar*, 80 Me. 152, 6 Am. St. Rep. 166; *Appeal of Walsh*, 122 Penn. St. 177, 9 Am. St. Rep. 83; note to *Drew* v. *Hagerty*, 14 Am. St. Rep. 257; *Scott* v. *Berkshire County Savings Bank*, 140 Mass. 157; *Alger* v. *The N. End Savings Bank*, 4 Am. St. Rep. 331; *Appeal of Wagnerbury College*, 56 Am. Rep. 252, 111 Pa. St. 130; *Overton* v. *Lawyer*, 7 Jones Law N. C. 6.) " Where the gift is not executed by delivery, but the determining act remains *in fieri*, the law gives no force to the mere intention to do it."

(*Crawford's Appeal*, 61 Penn. St. 52; *Accord Trough's Estate*, 75 Penn. St. 118.) See, also, 3 Redfield on Wills, p. 326, 329, 344, 349. So the voting of the stock, together with the vote being cast for the decedent for director with the donee's consent, after the gift, defeats it. Such an alleged gift of an uncle to a nephew is executory in its nature, and a court of equity will not complete it. (*Homes* v. *Roper*, 141 N. Y. 64-66; *Hanes* v. *Clark*, 3 N. Y. 93.) Again, under the authorities, the holder of national bank stock upon the books of the company is liable, as a stockholder, to the full face value of the stock so held, and that Andy was not able to respond to such liability is alleged, and not denied. (Ball on Banks and Banking, 153, 154 and 155, and authorities cited.) And his administrator is still liable to the same extent the decedent would be if living. (Revised Statutes U. S., § 5152.) The liability is directly to the creditors, and the remedy in their favor against such stockholder is exclusive. (*Fourth National Bank* v. *Francklyn*, 120 U. S. 747.) The status of the rights of the decedent, and his liabilities, have not been changed by the pretended gift. There was not such a delivery or relinquishment of the dominion or control of the stock as might have been made by the donor. (*Cook* v. *First National Bank, etc.*. 35 Am. St. Rep. 17, *et seq.*) Andy was cashier, and he could have made the transfers on the books of the bank if there had been a complete gift. (Morse on Banking, § 163.) The bank is a trustee for its stockholders, and no transfer of stock can be completed until shown upon the books of the bank. (*First National Bank* v. *Smith*, 65 Ill. 44.) In *Richmond* v. *Jones*, 121 U. S. 58, 59, this language is used : "By section 5139 of the Revised Statutes, those persons only have the rights and liberties of stockholders who appear to be such as are registered on the books of the association, the stock being transferable only in that way. No person becomes a shareholder subject to such liabilities and succeeding to such rights except by such transfer. * * Here there is no proof as in that case of he delivery of the certificates to the bank and a power of attorney authorizing its transfer with a request to do

so, made at the time of the transaction.'' It is not claimed or pretended here that the decedent ever endorsed or assigned the stock or gave to Andy during his lifetime any positive authority to have the stock transferred, so as to arm him with the necessary vouchers to place the bank in default upon his demand for the transfer, and the bank rightfully refuses to do so. He asks the court by its decree to put him in a situation to require the transfer which the decedent had failed to do.) (Thornton on Gifts, § 256.) Until the assignment and power is executed the donor has not placed the donee in a condition to demand the transfer which alone creates the rights and relieves the liabilities of the donor, and equity will not aid in doing, or in creating, or in establishing a trust in gifts. (*Overton* v. *Sawyer*, 7 Jones Law, 6; *Crawford's Appeal*, 61 Penn. St. 52; *Bayley* v. *Bandcott*, 4 Russ. 345; *Glass* v. *Burt*, 8 Ontario 391; *Smith* v. *Dorsey*, 38 Ind. 451; *Houghton* v. *Houghton*, 34 Hun. 212; *Brownlee* v. *Fenwick*, 103 Mo. 120; *Andrew* v. *Scott*, 94 Mo. 637.)

V. The court erred in admitting the testimony of John E. Davis, that Andy directed him to cast the 950 shares of stock for the alleged donee for director, for the purpose of showing the exercise of dominion and control over the stock by Andy in the absence and without the knowledge of the decedent. (Thornton on Gifts, §§ 400–401; *Finn* v. *Brown*, 142 U. S. 67, 68, 69, and especially 71 and 72; *Potter* v. *Allen*, 54 Ga. 623; *Davis* v. *Bowman*, 55 Miss. 671; *Warren* v. *Warren*, 105 Ill. 568–572; *Duff* v. *Leary*, 143 Mass. 533.)

*W. W. Dixon, Forbis & Forbis* and *M. Kirkpatrick*, for Respondent, Davis.

I. As to the legal definition of a gift *causa mortis*, see: 3 Pom. Eq. Jur. § 1146, *et seq;* 2 Blackstone Com. Cooley's Ed. 514 and note; *Ward* v. *Turner*, 2 Ves. Sr. 431; *Kenniston* v. *Skeva*, 54 N. H. 24; 2 Schouler Pers. Prop. §§ 135, 138; White and Tudor's Leading Cases in Equity, p. 1220. Thornton on Gifts, § 21, making the gift dependent upon conditions precedent. The supreme court of the United States in

*Basket* v. *Hassell* 107 U. S. 602 defines a gift *causa mortis* as dependant upon conditions subsequent.

II.   Was the gift made by the donor in contemplation or apprehension of death from an illness or disease then afflicting him ?   The trial court so found and the finding is amply supported by the testimony.   Whether the circumstances of expected death are sufficient is mainly a question of fact.   (*Ridden* v. *Thrall*, 125 N. Y. 579; *Grymes* v. *Hone*, 49 N. Y. 17; *Williams* v. *Guile*, 117 N. Y. 343; 2 Schouler, §§ 154, 156; *Nicholas* v. *Adams*, 2 Wharton 17; Thornton, §§ 23, 25, 26, 29, 30, 32, 34, 33, 24; 1 Story Eq. Jur. § 607; Willards Eq. Jur. 553; 8 Am. & Eng. Encyc. of Law, p. 1346; Roper on Legacies, p. 3.)   There can be no presumption against the gift on the ground of its magnitude.   (2 Schouler Pers. Prop. §§ 144, 145; 8 Encyc. of Law p. 1343; *Meach* v. *Meach*, 24 Vt. 591; *Thomas, Adm'r* v. *Lewis* (Va.), 15 S. E. 389, 397-8; White and Tudor L. Cases in Equity, Vol. 1. Pt. 2, p. 1251; *Field* v. *Shorb*, 99 Cal. 661, 670-1.)

III.   The subject of the gift being the stock of a national bank the question is presented as to whether property of this description may be made the subject of a valid gift *causa mortis*.   By the law as it stands at the present day, says Mr. Schouler, all kinds of personal property, corporeal and incorporeal, may be the subject of a valid gift *causa mortis*.   (2 Schouler Pers. Prop. §§ 72, 76, 147, and extended note to 23 Am. Dec. 600, 606.)   Mr. Thornton traces the rise and development of the doctrine in regard to gifts of unassigned negotiable paper and choses in action and says:   ''It may be stated that any written obligation is the subject of gift without indorsement or assignment.   Illustrations have already been given of notes, bonds and mortgages.   But the cases do not stop here and it is said that all evidences of indebtedness which may be regarded as representing the debt, whether with or without indorsement, are the subject of a *donatio mortis causa*.   (Thornton, § 273; Id. §§ 271, 274, 323, 343, 344.   And see *Grover* v. *Grover*, 24 Pick. 261; *Brown* v. *Brown*, 18 Conn. 410; Camp's Appeal, 36 Conn. 88; S. C. 4 Am. R. 39; 2 Red-

field on Wills, p. 312; *Tilinghast* v. *Wheaton*, 8 R. I. 536; S. C. 5 Am. R. 621; 1 Daniel Neg. Inst. §§ 24, 24a; *Stephenson's Admrs.* v. *King*, 81 Ky. 425; S. C. 50 Am. R. 172; *Hill* v. *Stephenson*, 63 Me. 364; S. C. 18 Am. R. 231; *Borneman* v. *Sedlinger*, 15 Me. 429; S. C. 33 Am. D. 626; *Drake* v. *Heiken*, 61 Cal. 346; *Westerlo* v. *De Witt*, 36 N. Y. 339; *Connor* v. *Root*, 11 Colo. 184; *Vandor* v. *Roach*, 73 Cal. 614; *Pierce* v. *Boston Savings Bank*, 129 Mass. 425; *Wing* v. *Merchant*, 57 Me. 383; *Bates' Admr.* v. *Kempton*, 7 Gray 382; *Hackney* v. *Voorman*, 62 Barb. 650; *Penfield* v. *Thayer*, 2 E. D. Smith 309; Estate of Malone, 13 Phila. Rep. 313.) In the following cases the courts sustained gifts *causa mortis* of stock: *Grymes* v. *Hone*, 49 N. Y. 17; *Walsh* v. *Sexton*, 55 Barb. 251; *Allerton* v. *Lang*, 10 Bosw. 362; *Reid* v. *Copeland*, 50 Conn. 472; 47 Am. Rep. 663; *Commonwealth* v. *Crompton*, 137 Pa. St. 138; see, also, *Ridden* v. *Thrall*, 125 N. Y. 572, 577; 1 Morawitz on Corporations, §§ 189, 192, 197, 226; Cook on Stock and Stockholders, § 308, in which it is said that: "A gift of stock *donatio causa mortis* may be made by a mere delivery of the certificates to the donee." In a note to the above it is said: "In England railway stock is not the subject of a *donatio causa mortis* by a delivery of the certificate since the transfer can only be by deed." Also see Lead. Cas. in Eq. Vol. 1. Pt. 2, p. 1250-1; 1 Spelling on Private Corporations, § 520; Lowell on Transfers of Stock, §§ 43, 109; *Johnson* v. *Laflin*, 103 U. S. 800; *Baldwin* v. *Canfield*, 26 Minn. 43; *Noyes* v. *Spaulding*, 27 Vt. 420. Sections 471 and 455, 5th division of the Compiled Statutes, when construed together, show that as between the parties, no transfer upon the books is necessary.

IV. It is urged on the part of the appellant that the donor did not part with his dominion and control over the bank stock, and that the transaction, being imperfect in this respect, cannot take effect as a gift *causa mortis*, but is testamentary in its character and void because not executed in accordance with the formalities prescribed by the statute of wills. If this was a valid gift, the donor could not by will have given the stock

to another, for a will does not operate until after the testator's death, at which precise point of time the gift would from its very nature become irrevocable, 2 Schouler, sec. 191, nor could the donor have obtained a transfer on the books to a second donee or vendee; for the surrender of the certificates was necessary to obtain such transfer on the books and the certificates had already been delivered to Andy. Therefore the donor having parted with the certificates had parted with his control over the stock until by a revocation he resumed it, and in this case there was no revocation. It is a breach of duty on the part of a corporation to allow a registry on its books without a surrender of the old certificates. (*Cushman* v. *Thayer Mf. Co.*, 76 N. Y. 365; *N. Y. & N. H. R. Co.* v. *Schuyler*, 34 N. Y. 83; Thornton on Gifts, § 354; Cook on Stock and Stockholders, § 403.) In the case at bar there was by the terms of the gift no limitation or suspension, as in *Basket* v. *Hassell.* The delivery was actual and direct with words of present gift. Standing alone it would have constituted a gift *inter vivos,* but being made in apprehension of death it was a gift *causa mortis* upon the recognized conditions. (*Devol* v. *Dye,* 123 Ind. 321; Thornton on Gifts, §§ 145, 148.) Similar language to that used by the donor in the present case is found in many of the cases which have been upheld as good gifts *causa mortis.* (*Snellgrove* v. *Bailey,* 3 Ark. 214; *Sessions* v. *Morely,* 4 Cush. 87; *Gass* v. *Simpson,* 4 Colo. 288; *Grimes* v. *Hone,* 49 N. Y. 17; *Ridden* v. *Thrall,* 125 N. Y. 572, 580; *Williams* v. *Guile,* 117 N. Y. 343, 348; *Curtis* v. *Portland Savings Bank,* 77 Me. 151; *Thomas' Admr.* v. *Lewis,* 15 S. E. 389, 398.) And see definitions of a gift *causa mortis* hereinbefore given. Also see *Henschel* v. *Mauren,* 69 Wis. 576 (2 Am. St. R. 757); *Crook* v. *Bank,* 83 Wis. 31 (Am. St. R. 17, 19, 23); *Goulding* v. *Horbury,* 85 Me. 227; *Canfield* v. *Davenport,* 27 N. Y. S. 494.

V. In some of the reported cases expressions are to be found which seem to imply that gifts *causa mortis* are regarded with disfavor as against some rule of public policy; that there is a *prima facie* presumption against their validity which is

only to be overcome by "clear, convincing, strong and satisfactory evidence," and that such gifts must be proved "beyond suspicion;" or "beyond reasonable doubt." This position is not sustained by reason or authority. (Thornton on Gifts, § 15; *Ellis* v. *Lecor*, 31 Mich. 185; 18 Am. Rep. 178; *Gibbs* v. *Carnahan* 25 N. Y. S. 786; *Lewis* v. *Merritt*, 113 N. Y. 386; *Devol* v. *Dye*, 123 Ind. 321; *Thomas' Admr.* v. *Lewis*, (Va.) 15 S. E. 399; *Tillinghast* v. *Wheaton*, 8 R. I. 536, 5 Am. R. 621; *Cook* v. *Dowling*, 26 N. Y. S. 764; *Brown* v. *Brown*, 18 Conn. 410; Thornton, §§ 15, 217, 218, 219, 220, 221, 222, 224, 230, 236, 262; 2 Schouler, §§ 94, 101.)

*B. P. Carpenter*, also for Respondent.

I.   To constitute a valid gift *causa mortis* all authorities agree that there are certain requirements, to-wit : *a.*  It must be made with a view to the donor's death.  *b.*  The donor must die without a recovery from the ailment or disease with which he was afflicted at the time of the gift.  *c.*  There must be such a delivery of the thing given as to confer upon the donee a legal or equitable title thereto, and a right to control the same.  To the foregoing is the qualification that the gift is defeated by the recovery of the donor from the ailment or disease, or by a revocation of the gift.  A good *donatio mortis causa* always implies that the (inchoate) gift will ripen into an absolute transfer of all beneficial interests, only if unrevoked at the death of the donor from the disease or peril existing at the time the (inchoate) gift was made.  (*Grymes* v. *Hone*, 49 N. Y. 21.  The condition is always implied, but should not be expressed.  (1 Travis on Sales, page 35, *et seq.*)

II.   That a valid gift *causa mortis* is made upon a condition precedent is established by an almost unbroken line of authorities, as shown in the brief of respondent.  Such also is the rule laid down in section 1553 of the Civil Code of Montana, which section as a declaration of the common law was a part of the Field Civil Code, and of the Civil Code of California.

III.   The appellant relies upon the case of *Basket* v. *Has-*

*sell*, 107 U. S. 602, as his main authority to the effect that the condition attached to a gift *causa mortis* is not a condition precedent, but a condition subsequent.   By a scrutiny of that case it will be seen that the alleged donor indorsed upon a certificate of deposit of money in a national bank an order to pay the amount to one Basket, after the death of the person who signed the order, and not before.   The court held that there was no valid gift *causa mortis*, because the proposed gift by its terms and condition was to take effect only upon the death of the donor, and there was no delivery of the property of the fund, but the delivery thereof was positively forbidden until the death of the donor.   The proposition that a gift *causa mortis* is made upon a condition subsequent is unsound.   (1 Travis on Sales, page 69.)

IV.   Let us compare the two doctrines as to the "condition."   *a.   Condition precedent*—I give you this property, and now deliver it to you, and it is to be under your absolute control, but it cannot be absolutely yours before my death, because I may get well or want it for myself.   *b.   Condition subsequent*—I give you this property and now deliver it to you, and it is now absolutely yours, but I may get well or take it back, and then it will not be yours.   *c.   Whichever the condition, and whatever the refinement of language, it is evident that the donee does not get an absolute title before the death of the donor.   So far as affects an honest donee, the distinction between the two forms of the condition is a "distinction without a difference."   So far as affects the donor, in case of his recovery, the "condition subsequent" doctrine would be more likely to result disastrously, and should not be encouraged.   So far as this case is concerned, there was a valid gift to Andy under either doctrine, as to the condition attached to a gift *causa mortis*.

V.   At the time of the gift the donor was sick with a disease and ailment of which he shortly afterwards died.   If during the continuance of that illness the donor had died from some other cause, the gift would not thereby have been defeated.   (*Ridden* v. *Thrall*, 125 N. Y. 579.)

VI. A gift is the transfer of the title, and possession, or means of obtaining possession, of property, without any consideration. It is an elementary and general principle that whatever may be sold, assigned, bequeathed or devised may be given, and a verbal assignment of any personal property is valid, indisputably as between the parties to the transaction. (*Penfield* v. *Thayer*, 2 E. D. Smith, 309, and cases cited; *Mack* v. *Mack*, 5 N. Y. Supreme Court (T. & C.), 530; *Vandermarck* v. *Vandermarck*, 55 How. Pr. 409; *Bedell* v. *Carll*, 33 N. Y. 585; *Fultz* v. *Walters*, 2 Mont. 165; *Commonwealth* v. *Crompton*, 20 Atl. 417.) To constitute a gift, there must be a union of the donor's intention to give, and a delivery of possession or the means of obtaining possession of the thing intended to be given, and in case of a gift *causa mortis* the implied condition of revocation is always attached, so that absolute title in the donee never exists until the time for revocation has passed. When the intent of the donor to give is established every act or word of the donor is to be construed in such a way as to carry into effect that intent. The same rule should apply as in case of legacies. Every doubt or seeming ambiguity should if possible be so solved as to affectuate the intention of the giver. In this case the gift can be upheld either as a gift *inter vivos* or *causa mortis*. (*Bedell* v. *Carll*, 33 N. Y. 585.)

VII. The donor clearly intended to give the stock. The donor had for a long time previously and frequently declared his intention to give the stock to Andy. Testimony as to such previous declarations was admissible in evidence. (Mayer's Appeal, 77 Penn. 486; *Alston* v. *Rowle*, 13 Fla. 128; *Jacobs* v. *Hessler*, 113 Mass. 161; *Doe* v. *Allen*, 12 Adolphus & Ellis 451; *Marks* v. *McGlynn*, 88 N. Y. 374; *Graniac* v. *Arden*, 10 Johns, 296; *Cooper* v. *Burr*, 45 Barb. 33; *Hackney* v *Vrooman*, 62 Barb. 666.) The donor after making the gift declared and admitted that the stock belonged to Andy. Proof of such admissions and declarations is proper. (*Whitaker* v. *Tathan*, 7 Bing. 628; *Mack* v. *Mack*, 5 N. Y. Sup. Ct. (T. & C.) 529; *Beaver* v. *Beaver et al.*, 117 N. Y. 429.)

VIII. There was a delivery and acceptance of the certificates, and this was intended to be and was a delivery and acceptance of the stock. Bank stock is incorporeal and incapable of delivery, except symbolically. A delivery of the certificate is generally treated as, and is a delivery of, the stock it represents, without any power of attorney or written assignment. The certificate represents and embodies the value of the stock, just as a greenback or silver certificate, worthless in itself, represents value, and is received as valuable, and therefore is valuable to the extent of the amount it represents. The delivery of the certificate is a symbolical or constructive delivery of the stock and valid as a delivery thereof. (Lowell on Transfers of Stocks, §§ 43 and 109 and cases there cited; 1 Cook on Stockholders, § 308; 1 Morawetz on Corporations, § 226.)

IX. The transfer of the certificates was equivalent to a transfer of the stock. "A gift of stock *donatio causa mortis* may be made by a mere delivery of the certificate to the donee." (1 Cook on Stockholders, § 308; *Allerton* v. *Lang*, 10 Bosworth 362; *Walsh* v. *Sexton*, 55 Barb. 251; *Grymes* v. *Hone*, 40 N. Y. 17; *Cornell* v. *Cornell*, 12 Hun. 312; 1 Morawetz on Corporations, § 226.) An equitable title to the stock was given by the transfer of the certificates, and from this equitable title a legal title to the stock may be enforced. (1 Story's Eq. Jur. § 607 *et seq.*) But, as we have already seen, as between the parties there was a complete transfer of the legal title. In England a transfer of corporate shares cannot be made by simple delivery of certificates, because such transfer is there required to be made by deed. The "common law of England," as referred to in the Montana statutes, means simply the "common law" as expounded by the courts of America. The "common law" in a chrysalis state should not be mistaken for the common law of our time, which has expanded or been modified and is perfected to apply to the changed conditions of a people. The words, "common law of England," were used simply as descriptive terms, and as indicating the source of our common law, and the words, "of

England," are expletive. (*Wheaton* v. *Peters*, 8 Peters 659.)
The common law of England (proper) on the subject of gifts
*causà mortis* may be found in Bacon's Abridgement (the sev-
enth edition, corrected), under the caption, "Legacies (A)."

X.    The donor never had possession or control of the cer-
tificates of stock after the gift and delivery to Andy, Decem-
ber 27 or 28, 1889, and the donee retained possession or con-
trol until the donor's death, and still has possession and con-
trol.

XI.    To transfer the equitable title to the stock, and the
beneficial interest therein to Andy, or even to transfer the le-
gal title as between the parties, it was not necessary that the
stock be transferred on the books of the bank.    The national
banking act prescribes no exclusive method of transfer. (*Scott*
v. *Pequonnock Bank*, 15 Fed. 494.)    The record of the trans-
fer is required only to protect the bank and its creditors, but
does not effect the rights of the parties as to each other.
(*Black* v. *Zacharie* 3 How. 513; *Cushman* v. *Manufacturing
Co.*, 76 N. Y. 365; *McNeil* v. *Tenth National Bank*, 46 N.
Y. 331.)    The forbearance of the donee to have the stock
transferred on the books of the bank is immaterial.    (*Basket*
v. *Hassell*, 107 U. S. 615.)    By subdivision 6 of section 5136
of U. S. Revised Statutes, a national banking association may
"prescribe by its board of directors by-laws not inconsistent
with law, regulating the manner in which its stock may be
transferred."    By section 5139 it is provided that "The
capital stock of each association shall be divided into shares of
one hundred dollars each, and be deemed personal property,
and transferable *on the books* of the association in such manner
as may be prescribed by the by-laws of the association."    The
provisions of the national banking act were not intended to af-
fect any transfer of ownership between individuals, where the
bank or its creditors were not injuriously affected.    The two
sections read together relate only to the transfer of shares on
the books of the bank.    If a transfer *on the books of the bank*
is required to give any title or interest to the transferree
of shares, then the delivery of a certificate with an assignment

or power of attorney indorsed thereon would give no better title than would the delivery of the certificate alone, but the United States supreme court has several times held in cases where the certificate was so indorsed that title to the stock was transferred by the delivery of such indorsed certificate, but has never held that such indorsement was necessary. It therefore logically follows that the delivery of a naked certificate has the same effect in transferring title to shares under the national banking act as the delivery of an indorsed certificate, and does give an equitable ownership to the purchaser or donee, and that a transfer on the books of the bank is not necessary to transfer the equitable title of the shareholder. (*Black* v. *Zackarie*, 3 How. 513; *Johnston* v. *Laflin*, 103 U. S. 804; *National Bank* v. *Watsontown Bank*, 105 U. S. 220.)

XII.　There is no federal question to be decided. The question to be decided is whether there was a valid gift *causa mortis*. 1.　Whether the equitable title to the stock passed by delivery of the certificate is simply a question to be determined by the common law. 2.　The statutes of the United States do not attempt to regulate the transfer of an equitable title.　If there is a federal question involved, it is whether an interest in national bank shares can be legally transferred by A (the owner) to B (the donee or purchaser), so as to give the equitable title to B, without a transfer of the shares on the books of the bank.　If this was ever a question arising under the statutes of the United States it is so no longer.　The United States supreme court has decided that a transfer on the books of a national bank is not necessary to give to a donee or purchaser an equitable title to the shares. (*Black* v. *Zacharie*, 3 How. 513, *supra*; *Johnston* v. *Laflin*, 103 U. S. 804, *supra*; *National Bank* v. *Watsontown Bank*, 105 U. S. 220 *supra*.)　There may be a valid sale of stock without a transfer on the books of the bank. (*Bank* v. *Lanier*, 11 Wall. 378.) A proposition once decided by the United States supreme court is no longer to be treated as a federal question. (*Kansas* v. *Bradley*, 26 Fed. 289.)　A federal question is not presented simply because the ownership of national bank shares is in

controversy. ( *Williams* v. *Weaver*, 100 U. S. 547; *LeSassier* v. *Kennedy*, 123 U. S. 521.)

HUNT, J.—As is often, perhaps generally, the case in suits where property is claimed as a *donatio causa mortis*, the court is not seriously embarrassed by conflicts in the testimony. When the idea pervades the mind that death is certainly close at hand, and that it is a fitting time to act in relation to property affairs with a view to their disposition in case of death, a reflecting sense of the occasion whereon they may act bids men seek the unobtrusive confidence and privacy of close friendships, trusted counsel or strong ties of consanguinity. It therefore happens that our duty in judicially considering this case is not made so difficult by deciding which of various accounts of the transaction is true, as to correctly weigh what was said, and then to ascertain what are the correct legal principles to control, and apply them to the facts as they stand, without material contradiction or dispute.

Now, (1) what was the intention of Judge Davis? What is the evidence in point of fact? How strong is it, and of what weight? And (2) to what legal results must that evidence lead us?

Here was a rich old man, who felt that he and his wealth must soon be parted. With nearly 70 years of busy life behind him, his time to lay down its cares had come. Ill health and disease were in him, and he knew it. Premonitions of death, well-founded apprehensions that he was too old to recover, bade him adjust his business. With no family ties to make his life less within himself, reticent of speech concerning his own affairs, this old millionaire evinced but one genuine attachment in the ebb of his life. To his namesake and his nephew his heart went out in quiet, undemonstrative solicitude, as it did to no one else on earth. Business confidence, accompanied, no doubt, by a disposition, natural to one in Judge Davis' situation, yearning for some one in whom his affections might center, prompted him to select Andy, of all others, to uphold his name, and perpetuate the particular pride of his

business career,—the First National Bank of Butte.   "Andy will have the bank some day. Thus it will remain in the Davis family.   Thus it will remain under Davis management. I will let it form no part of my estate.   Bring me my box, and let one trusted friend witness my contemplated act."   There we observe method.   There we find unreserved indications of a fixed plan to give the bank to Andy, and mark intelligent preparations to execute the plan.   There, too, was the fast declining health, and the expectation of death soon to come from disease already upon him.   Alone in his bedroom, with his nephew and friend, the mind of the decedent still bent on the plan already instituted.   First, the exact verification of the number of certificates of shares.   Then, without delay, with his own hand, a tradition of the certificates to his nephew.   "I have always intended that for you, and now I will do it."   There was the act which proved the sincerity of the intention to give.   There was the execution of the plan in view when the box was ordered brought down.   There was the proof that the bank was not intended to be part of the estate, and there, withal, was the hovering apprehension of death moving the donor to execute his plan without delay.   Andy took the stock and put it in his pocket in his uncle's presence.   There was an acceptance of the gift.   The scene, at night ; the delivery itself, upon the eve of departure to fight against the inevitable; the words; the enfeebled health and age of Judge Davis; the magnitude of the gift,—all naturally suggested to his two listeners that he anticipated death very soon.   Straightway his nephew and friend, in a spirit of hopefulness and sympathy incident to such solemn occasions, told him they did not think him so ill.   "The train may jump the track and kill me. *   *   *   If I don't come back, or anything happens, I want you to have that.   *   *   *   I am an old man, and there is no telling.   *   *   *   I don't think I can get over this disease. I can't stand it.   *   *   *   I can't expect it.   *   *   *   I only hope it will be so, but I don't think it."   These were the serious words of a very sick man, who believed that death was close at hand.   The last expressions were born of that

hope which is in the mind of nearly every man until the last
vital spark is extinguished.   Then the departure for Tacoma.
In that act we find an additional reason for the previous con-
duct of the donor.   He was going away with, at most, a faint
hope of recovery, and realized that he might never see Andy
again.   The opportunity was ripe for the execution of his
long-announced plan.   "Now take it."   He believed the bank
was severed from any estate he might leave.   Andy had the
bank, he thought; and it would forever remain in the Davis
name and in the Davis management.   The human object of his
affection had been considered in the manner he had said he
would regard him.   All other material affairs might rest upon
the possibility of future action.   So far as Judge Davis was
concerned, the purpose towards which his thoughts were
directed was accomplished.   He believed on that night that his
plan was consummated.

The appellant would break the force of all these facts and
circumstances by arguing that the testimony discloses an
intention only on the part of the decedent, *when he died*, to give
Andy the bank stock.   He urges that decedent knew the by-
laws of the bank and the national banking laws, which said
that no transfer of stock could be made, except by the assign-
ment thereof and transfer upon the books, and that, if he
intended to divest himself of his title, he would have used the
pen and ink so close at hand.   But, the by-laws did not require
any indorsement or assignment or power of attorney, in writ-
ing or otherwise, upon the certificates of the stock, or else-
where, to transfer them, but only an assignment or transfer on
the transfer books of the bank.   There was no provision that
even this assignment or transfer must be made by the stock-
holder or his attorney.   The certificates stated on their face
that the stock was transferable only by the holder or his attor-
ney on the books of the bank on the surrender of the certifi-
cates.   There was no assignment or power of attorney on the
back of the certificates given to Andy.   The by-laws required
no blank for such a purpose.   To make the transfer on the
books of the bank would have required the presence of the

transfer books and a surrender of the certificates; but the books were not at hand.    The mind of the donor was upon one essential feature as alone indispensable to his purpose,—the actual surrender of the certificates themselves.    Thus would he part with the representatives of his ownership.    This, he thought, was the all and only important act of his intended gift.    And this he did.

Next, as to the words spoken in the decedent's room.    The appellant would do away with our view by quoting the testimony of Talbott, given on a former hearing.    We agree with the learned counsel for the appellant that the statements of Talbott on the former hearing ought to be considered with those given upon the trial of this suit; but, in considering them, we bear in mind that there is no contention or insinuation by the appellant that Talbott has testified falsely.    The lower court must have believed that, in his testimony, he tried to hold hard to the truth; and we shall treat his several statements as complementary of one another.    The salient points are conspicuously and uniformly brought out,—namely, the actual and perilous sickness of Judge Davis, and the actual and manual delivery of the certificates to Andy by way of gift. The assurances were then made by Talbott and Andy to Judge Davis that he was not so ill as he thought himself.    Thereupon Judge Davis, not wishing to dwell upon so painful a subject as death, and to parry further reference to his physical condition, expressed the possibility of being killed in a railroad accident, and added, "If I don't come back, or anything happens to me, I want you to have that."    Then followed the further statements by Judge Davis to the effect that he could not expect to recover from his disease.    This must have been the exact situation at the interview, for Talbott expressly says the way that Judge Davis came to make the remark about the train jumping the track and killing him was because he and Andy tried to "brace him up, make him think he was not so bad off, you know," and after that remark Judge Davis said the train might jump the track.    This statement of Talbott's that the remarks of Judge Davis were not made until after the

tradition of the certificates themselves, is of importance, and greatly strengthens our opinion that there were no qualifications to the gift, other than those inherent in all gifts, *causa mortis,* and that the donor intended none other to be attached.

It must never be forgotten that, just before the judge made any remarks, he had delivered the certificates, without any words of qualification, and this act properly aids us in interpreting the meaning of the donor in his subsequent words. (Thornton on Gifts, p. 122.) The stock certificates had been delivered. The intention of Judge Davis was executed. If Andy and Talbott had prepared to leave the room at once, would Judge Davis have said anything more about the gift? We think not. Or if, remaining, they had made no reference whatsoever, after the tradition, to his physical condition, is it not reasonable to say that no other word would have been spoken on the subject of the gift by the donor himself? We think so. The very fact that the statements were not called out except by way of response to the remarks of Andy and Talbott, in the light of what Judge Davis had done before, makes them but explanations of the reason why the donor had given the certificates to his nephew at that particular time.

This construction of the remarks of Judge Davis, after the certificates had been delivered, is not only consistent with the prior acts and statements of the donor at the moment of the delivery and gift itself, but is in strict accord with his intention, as manifested by repeated prior declarations to friends.

But, if we are in error in that reasoning, let us follow the theory of appellant's counsel, and consider all the acts and the conversation together, as forming essential and inseparable parts of the act of delivery. To proceed, then: Suppose the donor had said, at the time he handed the certificates over, "I always intended that for you. I want you to take it," and then added, "If I don't come back I want you to have that. I am an old man and cannot expect to recover,"— then appellant's argument that the condition of death while away at Tacoma was attached to the gift would have been of

force, and a return might, *ipso facto*, have operated as a revocation of the gift. We here remark that we attach no significance to any fear on the decedent's part of being killed by a railroad accident. That idea is, in our judgment, incompatible with the evidence of every act and word and thought of the donor at the time of the delivery of the certificates. Death from his illness was the only current of his thoughts.

But the foregoing line of reasoning cannot be pursued without departure from appellant's theory, because it eliminates another and material part of the statement of the decedent, namely, the alternative condition, "or if anything happens, I want you to have that." Let us, therefore, take up this further qualification, and by adding it on, we have these words: "I have always intended that for you and I want you to take it. If I do not come back or anything happens I want you to have that. I am an old man, and cannot expect to recover." Considered with the act of delivery of the certificates, we find that the gift was not limited to the event of death on his trip, only, but comprehended death at any time in the near future. Now, if we put the several whole sentences together, and connect them exactly with the delivery, we have this condition of testimony: Judge Davis: "I have always intended that for you, now take it." The certificates are handed over. Talbott: "You are not so bad off as you think." Judge Davis: "I don't know whether I will ever come back or not. There may be an accident on the railroad. If I don't come back, or anything happens, I want you to have that. I am an old man, and there is no telling. I can't stand what I used to. I don't think I can get over this disease. I can't stand it. I am too old. I can't expect it." Talbott: "We think you will come back, and that you will live 10 or 15 years." There we have one portion of the sentence, "if I don't come back or anything happens," imposing conditions of death before a return from Tacoma, and the succeeding and last portion expressly without conditions whatsoever pertaining to the particular journey about to be begun. Here the argument of appellant must be that the qualification or limitation placed

upon the first portion of the sentence governs the latter as well. If this be correct, we render the latter portion of the sentence, namely, the words, "or if anything happens, I want you to have that," entirely superfluous and meaningless. They are ignored. But, if they were meaningless, why did the donor express them? Surely, if everything said is part of the gift, no construction can be accurate which would omit to give some effect to these latter words, as well as to all others. The only way to do so is to interpret the whole sentence by the light of all else done and said, before and afterwards. Doing this, the donor said: "Take this stock. I have always intended to give it to you, and now I will do it. I believe I am a dying man. I have but little hope of recovery. If I do not live to come back, or if I die soon, then this stock is absolutely yours."

We cannot say by which process of reasoning the district court was moved to adopt its primary conclusion that Judge Davis intended a gift *causa mortis*, at the interview on the night before his departure for Tacoma The first view, in our opinion, is correct, and we adopt it; but both analyses of all that was said and done lead to the same logical deduction. Each is built upon the firm and unshaken evidential foundation of an oft-repeated intent of the donor to give the bank, some day, to Andy, and upon that other and most convincing act, the manual delivery of the certificates by Judge Davis while in a condition of health which clearly evinced his apprehension of speedy death.

We cannot find, in our consideration of the case up to this point, substantial support for the argument that, by any words or acts of the donor, prior to his departure for Tacoma, he intended the gift to be dependent only upon his failure to return to Butte; for, no matter what refinements may be given to the language of the donor, no force of speech at this time can overcome the fact that the donor, sagacious and close man that he was, parted with the certificates. Probably, too, Talbott's language was not, at the first hearing (which was not a trial of the ownership of the stock), precise in its details of the occur-

rence, for he says that he does not see any substantial difference between what he said at that time and upon the trial of this case.    But, assuming that what he said on each trial was an exact statement, we certainly cannot now say that the district court was not warranted in its conclusion that the donor intended to give the stock to the donee at the time of the delivery thereof.    The finding, therefore, to that effect, must be sustained, unless subsequent events, by themselves or in connection with preceding affairs, overthrow the finding, or the law will not permit it to stand.

The appellant opens his exhaustive argument with references to the early English text writers and their definitions of gifts *causa mortis*.   We will therefore go further back than he does, and briefly examine the law, to determine whether his primary inferences are sound.

If we revert to the Institutes of Justinian, published A. D. 533, (*Imperatoris Justiniani Institutiones*, by J. B. Moyle), we find the first definition of the essential conditions of a *donatio mortis causa*, as a primary source of the meaning adopted in the common-law reports of England, and in the decisions of many of our own most learned courts. Omitting the Latin text, and accepting the translation of Professor Hammond (Sandars, Just., page 218), we find : "A donation *mortis causa* is that which is made to meet the case of death, as when anything is given upon condition that, if any fatal accident befalls the donor, the person to whom it is given shall have it as his own; but, if the donor should survive, or if he should repent of having made the gift, or if the person to whom it has been given should die before the donor, then the donor shall receive back the thing given.    These donations *mortis causa* are now placed exactly on the footing of legacies. It was much doubted by the jurists whether they ought to be considered as a gift or as a legacy, partaking as they did, in some respects, of the nature of both; and some were of opinion that they belonged to the one head, and others that they belonged to the other.    We have decided, by a constitution that they shall be in almost every respect reckoned among

legacies, and shall be made in accordance with the forms our
constitution provides.    In short, it is a donation *mortis causa*
when the donor wishes that the thing given should belong to
himself rather than to the person to whom he gives it, and to
that person rather than to his own heir."

The original text adds a line illustrating gifts *causa mortis*
by reference to the Odyssey of Homer, where Telemachus
makes presents to Piræus if he be killed.    Sandars then pro-
ceeds to elaborate the text as follows :    "There are two es-
sential conditions of a *donatio mortis causa :*    It must be made
with a view of meeting the case of death; it must be made to
take effect only if death occurs, and so as to be revocable at
any time previous, and to fail if the recipient died before the
giver.    The donor might, however, at his pleasure, alter the
character of the gift, making it irrevocable, but it was always
dependent on the recipient outliving the donor.    *    *    *    It
might be made conditional upon death in two ways.    The
donor might say, 'I hand you over my horse, but the gift is
only to be complete if I die in this enterprise.'    Or he might
say, 'I give you my horse.    If I survive this enterprise you
are to give it back to me.'    In the latter method, the delivery
of the thing is made at once, subject to a conditional rede-
livery.    In the former the delivery is made conditional.    *
*    *    If the gift was made in the first of the two ways above
mentioned, although there was delivery, yet the thing was
only acquired on the death of the donor, and, the donor not
having ceased to be *dominus,* could therefore, if he revoked
the gift, bring a real action to reclaim the thing handed over.
If the gift was made in the second way, the whole property
passed at once by the tradition to the recipient; and as, in the
older and stricter law, the *dominium* passed absolutely when
it passed at all, the property in the thing could not revert to
the donor merely by the condition having been accomplished.
He would only have a personal action against the recipient to
compel him to give the value of the thing, if he did not choose
to give back the thing itself.    The later jurists seem, how-

ever, to consider that the *dominium* reverted *ipso jure*, and that the donor could bring a real action for the thing itself.'' (Page 219.)

In these definitions it is to be observed that the distinction between conditions precedent and subsequent is not as closely drawn, as the test of whether the gift may be upheld, as by some modern authorities. Such gifts were regarded as standing ''midway between legacies and gifts *inter vivos*. In that it consists in a present act of bounty, it differs from a legacy, which confers no right whatever on the legatee until the testator is dead, and his heir has accepted the inheritence. Here if the donee outlives the donor, the thing given never goes to the heirs at all. It differs from the latter in being absolutely perfected only by the donor's decease. The gift may be made so conditional on that event that the property in the gift does not pass to the donee until its occurrence. In the meanwhile he has only its use and enjoyment. Or the property may pass at once, subject to the understanding that it is to revert to the donor in case of his proving the better life.'' Moyle's Comments on Justinian's definitions, page 222, note 1.

Inasmuch as the appellant founds his discussion of the description and nature of *donationes causa mortis* upon Swinburne, who wrote upon the Civil Law in the latter part of the sixteenth century, we give that commentator's definition : ''One, when the giver is not terrified with fear of any present peril, but moved with general consideration of man's mortality giveth anything. Another, when the giver being moved with imminent danger, doth so give, that straightways it is made his to whom it is given. The third is when any being in peril of death, doth give something, but not so that it shall presently be his that received it, but in case the giver do die.'' (Swinburne on Wills, Powell's Edition, 1803.)

The earliest decisions, next after Swinburne's text-book, to which we have accessible reference, begin with *Drury* v. *Smith*, 1 P. Wms. 405, where Lord Cowper, in 1717, held that, where a testator, in his last sickness, made a gift, and the possession was transmuted to his nephew, it must be upheld, be-

cause "he might, in his lifetime, after the making of his will, give away any part of his estate absolutely, and, by the same reason, notwithstanding the will, give away any part thereof conditionally, and this gift, being so fully proved," was held to be a *donatio mortis causa.*

That a delivery has always been held necessary in England is also sustained by *Lawson* v. *Lawson,* Id. 441, where a gift was made by a husband, in his last sickness, to his wife of a purse with money in it.

In *Miller* v. *Miller,* 3 P. Wms. 356, just before death the testator called to his servant to reach him his pocketbook, took thereout two bank notes for £300 each, and another note for £100, not being a cash note, or payable to bearer, all of which notes he ordered his servant to deliver to his wife, who was present. Afterwards the testator, by word of mouth, gave her his coach and horses. The gift of the bank notes for £600 was sustained upon the ground that the party was in his last sickness, and that they were delivered.

The next case, and what may be termed a leading one in England, was Lord Hardwicke's opinion, in 1752, in *Ward* v. *Turner,* 2 Ves. Sr. 431. It cited the last two cases just above referred to, sustaining the doctrine that there must be an actual delivery. The deductions from the discussion in that case are well summed up by an English writer (Shearwood) in an Elementary outline of the principles of equity. He says that Lord Hardwicke decided that a gift of this description, in order to be valid, must be made : (1) In such a state of illness or expectation of death as would warrant a supposition that the gift was made in contemplation of that event. (2) On condition that it is to become absolute only upon the event of the donor's death. It follows from this that it is a gift revocable during the donor's lifetime. (3) There must be actual delivery.

Advancing, next, to the time of Blackstone, that commentator treats this species of gift as "another deathbed disposition of property," and thus defines it: "And that is, when a person, in his last sickness, apprehending his dissolution near, de-

livers or causes to be delivered to another the possession of any personal goods, under which have been included bonds and bills drawn by the deceased upon his banker, to keep in case of his decease. This gift, if the donor dies, needs not the assent of his executor; yet it shall not prevail against creditors, and is accompanied with this implied trust, that, if the donor lives, the property thereof shall revert to himself, being only given in contemplation of death, or *causa mortis*. This method of donation might have subsisted in a state of nature, being always accompanied with delivery of actual possession, and so far differs from a testamentary disposition; but seems to have been handed to us from the civil lawyers, who themselves borrowed it from the Greeks." (Ham. Bl. Comm., page 771.)

In *Tate* v. *Hilbert*, 2 Ves. Jr. 111, Lord Loughborough, in 1793, discusses the delivery essential to sustain a *donatio mortis causa*, and disapproves of the definitions of Swinburne heretofore referred to. He treats them as only references to different texts of the civil law, and says that Swinburne, in his definitions, "is coupling the description of a legacy with a very short text of the civil law, and there is a perplexity in it." He further says that the first two definitions, the second of which the appellant in this case relies upon, are clearly mere donations. He then discusses the books of Justinian, and says that Swinburne ought to have looked a little farther, and he would have found a history by Justinian of the contest upon the subject of gifts. The exact text from Justinian, from which Professor Hammond has worked his translation, as given above, is quoted in full by Lord Loughborough, who thus approves: "There it is clearly and correctly defined that it had in effect the nature of a legacy, was liable to debts, and that it was only a gift upon survivorship; and the danger of suffering these gifts to be taken loosely occasioned, at the same time, with the passage I have read, an ordinance by the emperor, that it should be in writing with five witnesses." He then refers to *Ward* v. *Turner*, and concurs with the reasoning that there must be some delivery of the property. We cite this

case, having had access to the same and studied it with much care, to demonstrate that that portion of Swinburne's definition upon which the appellant relies has not met with approval by the most learned judges in England since Swinburne wrote. Powell in his comments and annotations to Swinburne's text also says : " The two first instances    *    *    are simple gifts, the latter only applies to the *donatio causa mortis* and is better described or defined in *lege* 27 and in *Justin. Inst. tit. de donationibus.*" See note to Powell's Swinburne on Wills, page 54, Part I. Roper on Legacies approves of the criticisms of Swinburne by Loughborough in *Tate* v. *Hilbert*, and unequivocally states in his text that "it appears, upon consideration of the before-mentioned definitions (Swinburne's), that the third alone is the proper *donatio mortis causa*; the other two being nothing else than pure irrevocable gifts *inter vivos.*" (1 Rop. Leg. c. 1.)

Other English writers have followed Justinian's definition, with the qualification, recognized by Lord Hardwicke in *Ward* v. *Turner*, that a delivery was essential. Spence on Equitable Jurisdiction, in 1846, called a *donatio causa mortis* a disposition of property "when a person in a sickness, apprehending his dissolution near, delivers or causes to be delivered any personal goods or chattels to another, or puts the physical means of dominion over them into his power to keep for himself or for some one else, in case of the donor's decease.    *    *    *    In the event of the donor recovering, the property reverts to him. If the donor die, the property belongs to the donee, without the assent of the executor, though not as against creditors." (1 Spence, Eq. Jur. p. 196.) Williams on Executors (page 887, c. 2, § 4) briefly summarizes the attributes of a *donatio mortis causa* as follows: "First, the gift must be with a view to the donor's death; second, it must be conditioned to take effect only on the death of the donor by his existing disorder; third, there must be a delivery of the subject of the donation."

In America, commentators, in their definitions, have followed in the line of the mother country. Kent says that such

gifts are conditional, like legacies, and it is essential to them that the donor make them in his last illness, or in contemplation and in expectation of death, and that there must be a delivery. * * * A gift *inter vivos* was irrevocable; but a gift *causa mortis* was conditional and revocable. (2 Kent, Comm. p. 444.) Judge Story says such a gift is properly "a gift of personal property by a party who is in peril of death, upon condition that it shall presently belong to the donee in case the donor shall die, but not otherwise. To give it effect there must be a delivery of it by the donor, and it is subject to be defeated by his subsequent personal revocation, or by his recovery or escape from the impending peril of death. If no event happens which revokes it, the title of the donee is deemed to be directly derived from the donor in his lifetime, and therefore in no sense is it a testamentary act." (Story, Eq. Jur. § 606.)

The supreme court of Connecticut, many years ago, defined these gifts as follows: "That species of donation is derived wholly from the civil law, and is where a person, in his last sickness, apprehending his dissolution near, delivers to another personal property, under which have been included bonds payable to the donor and bank bills, to keep in case of the donor's death. Three requisites are necessary to constitute a gift of this sort: (1) It must be made by the donor, in contemplation of the conceived approach of death; (2) it must be given to take effect only in case the donor dies; (3) and there must be a delivery of the subject of donation. It is essential that the condition of its not passing while the donor lives be included; otherwise, it will be a donation of another kind, namely, a *donatio inter vivos*. It differs from the latter in several respects, in which it resembles a legacy. It is ambulatory, incomplete, and revocable during the donor's life. The revocation may be effected either by the recovery of the donor from his disorder, or by taking back the possession of the property. It can be made to the wife of the donor. On the other hand, it differs from a legacy in several particulars. The claim need not be proved in a court of probate. The title

of the donee becomes, by relation, complete and absolute from the time of the delivery. No consent or other act, on the part of the executor or administrator, is necessary to perfect the title of the donee. It is a claim against the executor. A legacy is a claim from the executor." (*Raymond* v. *Sellick, et al.*, 10 Conn. 484.)

Without reviewing in detail the definitions of many more American writers, we find that the general requirements, as laid down by Williams on Executors, succinctly state the law. Of modern American commentators, certainly none are more perspicuous or intelligible in their definitions than Pomeroy, who sums up the discussion in the following words: "A gift absolute in form, made by the donor in anticipation of his speedy death, and intended to take effect and operate as a transfer of the title upon, and only upon, the happening of the donor's death. Between the time when the gift is made and the article donated is delivered, and the time when the donor dies, the donation is wholly inchoate and conditional. The property remains in the donor, awaiting the time of his death, and passes to the donee when the death, in anticipation of which the gift was made, happens, unless the donation has, in the meantime, been revoked by the donor. The donee thus becomes a trustee for the donor, with respect to the article delivered into his possession, until the gift is made perfect by the donor's death. The gift must be absolute, with the exception of the condition, inherent in its nature, depending upon the donor's death, as above described, and a delivery of the article donated is a necessary element; but it is subject to revocation by the act of the donor prior to death, and is completely revoked by the donor's recovery from the sickness, or escape from the danger, in view of which it was made." (3 Pom. Eq. Jur. § 1146. See, also, 2 Beach Mod. Eq. Jur. § 1061; *Grymes* v. *Hone,* 49 N. Y. 21; *Michener* v. *Dale,* 23 Pa. St. 63; Story Eq. Jur. pp. 599, 604; 2 Schouler Pers. Prop. §§ 135, 138; Thornt. Gifts § 21; Crosw. Ex'rs & Adm'rs § 620.)

In *Basket* v. *Hassell,* 107 U. S. 602, 2 Sup. Ct.

415, relied upon by appellant, it was said "that a *donatio causa mortis* must be completely executed, precisely as required in the case of gifts *inter vivos*, subject to be divested by the happening of any of the conditions subsequent,—that is, upon actual revocation by the donor or the donor's surviving the apprehended peril or outliving the donee," etc. "On the other hand, if the gift does not take effect, as an executed and complete transfer to the donee of possession and title, either legal or equitable, during the life of the donor, it is a testamentary disposition," etc.

Reverting to the appellant's theory of the evidence in this case, if the foregoing definition of Justice Matthews was meant to exactly conform with Swinburne's second definition and rejects all gifts, where a donor, with intent to make a gift *causa mortis*, delivers the property, and surrenders the possession and control of the subject-matter of the gift, with a statement, such as the donor used in this case, to the effect that, if he died, he wanted the donee to have the property delivered, then there has been a contraction of the generally accepted common-law rule that a gift *causa mortis* could be made by present delivery, yet conditioned upon the death of the donor. But it was not so decided upon the facts of that case, and we doubt whether the definition quoted conflicts with Mr. Pomeroy's, when the words used are measured by their strict applicability to the whole subject, and its nature, under consideration, and the inherent qualifications inseparably attached to all gifts *causa mortis*. We believe we are accurate in this last comment upon the opinion of Justice Matthews. We have examined the particular case upon which the reasoning of that opinion is laid,—a decision of the supreme court of Tennessee, made in 1867. (*Gass* v. *Simpson*, 4 Cold. 288.) The Tennessee case was this: The decedent was obliged to leave Tennessee to avoid the operations of the rebel conscription laws, and went to Kentucky, where he died, at Louisville, in 1863. Before leaving Tennessee, in 1862, he placed in the hands of Mary Simpson some gold and paper money, together

with notes, receipts, etc., and stated to her at the time, "If he never returned, he wanted it all to be given to her son, George M. Simpson," who was at that time a minor; and on the day he left he stated to others that, if he never returned he wanted "little George" to have what he had left in respondent's hands. The defendants contended that the facts constituted a valid *donatio causa mortis* of all the effects and money. The court, by Justice Hawkins, after taking up the definition of Swinburne, speaks of the contest which arose at an early day as to the real nature of gifts *causa mortis*, and expressly recognize that a gift *causa mortis* is a conditional gift, dependent upon the contingency of expected death, which need not be expressed or specified by the donor; and, after applying this principle to the facts in the case, it was held that a valid donation *causa mortis* existed in favor of George Simpson. A part of this discussion of the supreme court of Tennessee is quoted verbatim by Justice Matthews as the foundation for his subsequent deductions. After taking up another part of the opinion, to the effect that delivery was essential, he says that "a view of the entire passage leaves no room to doubt its meaning; that a *donatio mortis causa* must be completely executed, precisely as required in the case of gifts *inter vivos*, subject to be divested by the happening of any of the conditions subsequent,—that is, upon actual revocation by the donor, or by the donor's surviving the apprehended peril, or outliving the donee, or by the occurrence of a deficiency of assets necessary to pay the debts of the deceased donor. These conditions are the only qualifications that distinguish gifts *mortis causa* and *inter vivos*. On the other hand, if the gift does not take effect as an executed and complete transfer to the donee of possession and title, either legal or equitable, during the life of the donor, it is a testamentary disposition, good only if made and proved as a will."

A close scrutiny of Justice Matthews' deductions would seem, therefore, to demonstrate that he did not mean to disaffirm the general doctrine as it was enunciated by the supreme court of Tennessee. Indeed, he expressly affirms their meaning.

But, if the appellant is correct, in this case, in his interpreta-
tion of the definition of Justice Matthews, that distinguished
jurist has laid down a rule which, if it had been applied to the
very case whence it was deduced, could not have coincided with
the principles announced therein or with the conclusion reached
by the Tennessee court. We, therefore, cannot believe that the
United States supreme court intended to say that a gift made
in apprehension of death, and where the donor delivered the
property to the donee with an expression to the effect that the
property was to belong to the donee if he (the donor) should
die, could not be sustained. The leading English cases and
the civil law are not exhaustively examined, in the opinion of
Justice Matthews. He seems to have founded his opinion
as to what delivery would sustain the gift largely upon the
summarized law of the Tennessee case; but, by his elaboration
of the rule of the Tennessee case, although he affirmed the
law thereof, nevertheless, he has apparently laid down a doc-
trine often invoked and interpreted to defeat gifts *causa mortis*
where exactly such conditions were expressed by the donor as
the appellant contends were imposed by Judge Davis in this
case, but which would appear, under the weight of authority,
including the Tennessee decision, to but merely express the
condition which is annexed by law to every donation *causa
mortis*. For, no matter whether the gift is made upon death
or nonrevocation as a condition precedent or subsequent, upon
either condition an absolute and indefeasible title comes to the
donee only upon the donor's death. The gift must be absolute
in form by the donor while living. It cannot be absolute in fact
until his death. The supreme court of Arkansas, in *Hatcher*
v. *Buford* (1895) 27 L. R. A. 507, referred to *Basket* v. *Has-
sell* upon this point, and declined to follow the usually accepted
interpretation of it. Its apparent doctrine is also ably dis-
cussed in Travis on Sales, where the author speaks of the
" mistake " made by the supreme court.

But, however interesting it might be to enter upon a com-
parison of the various decisions, to determine whether the
appellant's interpretation of *Basket* v. *Hassell* is correct or not

upon the question of delivery, and to consider the divergencies of opinion, we refrain from so doing, because, under our view of the facts of this case, the gift herein was delivered, within the rule of the letter of the definition of that case, as appellant would apply it.

The facts of the case at bar so clearly demonstrate that the delivery of the certificates was made by Judge Davis in contemplation of speedy death from his disease, that it is unnecessary to dwell on that feature of the case. The prolonged and dangerous illness of the donor, his age, and the circumstances of the delivery fully show the expectation of Judge Davis to die shortly from the ailment from which he was then suffering. His trip to Puget Sound was but a desperate fight for life, or to prolong the life which he felt he must soon lose. The argument that he apprehended death from a railway accident, as said before, is not well founded, in our judgment. But, if it were, it could not avail appellant, because the decedent also apprehended death from his disease, and, inasmuch as he failed in health and died soon of such apprehended disease, which was the particular cause of death, with especial reference to which the delivery was made, it matters not that he may also have feared death from other and insufficient causes. "The rule is that the donor must not recover from the disease from which he then apprehended death. If he recovers, the gift is void; if he does not recover, and the gift is not revoked, it becomes effectual." (*Ridden* v. *Thrall*, 125 N. Y. 572, 26 N. E. 627; *Gourley* v. *Linsenbigler*, 51 Pa. St. 345, 56 Pa. St. 166; *Craig* v. *Kittredge*, 46 N. H. 57; Thornt. Gifts, § 23 *et seq.*; *Williams* v. *Guile*, 117 N. Y. 343, 22 N. E. 1071.)

Next, as to the important question of the effect of the delivery of the certificates of stock. We start with a delivery, and acceptance of the certificates at the time of the delivery, and the intention on Judge Davis' part to make a complete gift. But we have this question: The subject of the gift was bank stock, shares in a national bank, or the certificates thereof, without indorsement or assignment in writing, and without transfer on the books of the bank. Can national bank stock be so

transferred, and thus be made the subject of a valid gift *causa mortis?* The appellant asks a negative reply, and in an argument displaying great research and learning, bases his request upon the common law and cases construed by him to be within the reasoning of the English adjudications. And here, again, is a divergency of opinion between learned writers. Some years back the common law of England, so far as the same was applicable and of a general nature, and not in conflict with special enactments of the territory, was declared to be the law, and was to be considered of full force. But to determine what the common law is, are we to disregard the expositions by judicial authorities of our own country upon the common law? Clearly not. "No one," said Judge McLean, in *Wheaton* v. *Peters*, 8 Pet. 659, "will contend that the common law, as it existed in England, has ever been in force, in all its provisions, in any state in this Union. It was adopted so far only as its principles were suited to the condition of the colonies; and from this circumstance we see, what is common law in one state is not so considered in another. The judicial decisions, the usages and customs of the respective states, must determine how far the common law has been introduced and sanctioned in each."

Upon this question we quote from Chief Justice Shaw in *Com.* v. *York*, 9 Metc. (Mass.) 93, who thus wrote of the adoption of the rules and principles of the common law of England in their applicability to our conditions: "As this is an unwritten law, we must seek for the evidence of it in judicial records, precedents and decisions, and those digests, treatises, and commentaries of learned and experienced men which have acquired respect and confidence by long usage and general consent. If we consult English decisions made since the revolution, it is not because they have any binding force as rules, but because they are expositions of the rules and principles of the common law, by men of great experience and judgment in the knowledge and application of the same laws which we are seeking to expound. And, if we read the digests and treatises of reputable authors, published since we ceased to be English

subjects, it is because they contain the authentic records of the precedents and judicial proceedings which furnish the evidence of the common law.   In like manner the decisions of courts of other states having the same common origin and deriving their laws from the same common source, are valuable and useful in enabling us the more clearly to understand and the more fitly to apply the rules and principles of our own authoritative code of laws.''

The appellant relies at once upon Lord Hardwicke's opinion in *Ward* v. *Turner*.   Although some cases and writers do not regard that case as positively deciding that choses in action, such as stocks, cannot be effectually delivered as a gift *causa mortis*, without transfer of the legal property, yet it is generally cited to that holding.   The property there delivered was receipts for South Sea annuities.   We quote, in part, from the chancellor's opinion:   ''Nor does it appear to me, by proof, that possession of these three receipts continued with Mosely from the time they were given, in February, to the time of Fly's death; for there is a witness who speaks that, in some short time before his death, Fly showed him these receipts, and said he intended them for his uncle Mosely.   Therefore, I am of opinion it would be most dangerous to allow the donation *mortis causa*, from parol proof of delivery of such receipts, which are not regarded or taken care of after acceptance; and if these annuities are called choses in action, there is less reason to allow of it in this case than in any other chose in action, because stocks and annuities are capable of a transfer of the legal property by act of parliament, which might be done easily; and if the intestate had such an aversion to make a will as supposed, he might have transferred to Mosely.   Consequently, this is merely legatory and amounts to a nuncupative will, and contrary to the statute of frauds, and will introduce a a greater breach on that law than was ever yet made; for, if you take away the necessity of delivery of the thing given, it remains merely nuncupative.''   (*Ward* v. *Turner*, 1 White & T. Lead Cas. Eq. 1217.)

After the decision of *Ward* v. *Turner*, throughout the

various cases we find distinctions as to the extent to which Lord Hardwicke meant to go concerning the delivery of choses in action. There is a review of the history of these decisions in 1 Rop. Leg. pp. 10, 11, *et seq.* But, in 1827, Lord Eldon, under whose judgments have been recognized the expansion of those principles of equity which were matured in the time of Lord Hardwicke, cleared up much of the doubt which had existed before his time, and advanced to the point of construction upon which have been, to a great degree, founded the further expansions of our American courts.

*Duffield* v. *Elwes*, 1 Sim. & S. 243, was an action where the defendant was possessed of a bond for a certain sum of money, and had also a mortgage, created by a deed of even date with the bond, to secure the sum mentioned in the bond, and he had another mortgage for a large sum. The second mortgage was dated November 3, 1820. It recited that £30,000 had been advanced upon mortgage by Sir Sandys to the prior mortgagees, and further secured by a bond, and a judgment recovered, and that the mortgagees had called in the money. It was witnessed, in consideration of the £30,000 advanced by Elwes to Sandys to pay off the mortgage, that the money and judgment were assigned, and certain premises were also conveyed by mortgage from Sandys to Elwes to secure the £30,000. Elwes, when on his deathbed, and unable to write, declared that he gave the bond and mortgage, and the money secured by them, to his daughter, Mrs. Duffield. At the desire of Elwes they were delivered into the hands of Mrs. Duffield. The vice chancellor decided that the gift was not complete, because the delivery was not complete as a gift *inter vivos.* But, in the house of lords, Lord Eldon, after citing the authorities, observed: "Lord Hardwicke is clearly of opinion that the delivery of a bond as a specialty would do; and if, then, the debt is well given by the delivery of the bond, the next question is, what are we to do with the other securities, which are, or not, delivered over? In the present case, the bond, the assignment, the covenant, and all the deeds are delivered over in such a manner that the representatives of the donor

could not get at them; and the question is, whether, considering the difference between an absolute estate in land and a mortgage, the same principle does not apply in the case of a mortgage as in the case of a bond. Upon the whole, then, I am of opinion that the delivery of these securities is a good *donatio mortis causa*, as raising a trust by operation of law, and that as so raising a trust by operation of law, they are not within the provisions of the statute of frauds. (Rop. Leg. p. 19).

This celebrated case of *Duffield* v. *Elwes* is regarded as the turning point in the English law of property susceptible of delivery, and Lord Harwicke's distinction between "the delivery of property and the delivery of its evidence has assuredly lost its point." (2 Schouler, Pers. Prop. p. 115.) *Hewitt* v. *Kaye* (1868) E. L. R., Vol. 6, p. 198, recognizes the principle that "when a man on his deathbed gives to another an instrument, such as a bond or promissory note, or an I. O. U., he gives a chose in action and the delivery of the instrument confers upon the donee all the rights to the chose in action arising out of the instrument." The court approved of the doctrine laid down in *Amis* v. *Witt*, 33 Beav. 619.

The last English case that we have been able to find is *Robson* v. *Hamilton*, (1891) 2 L. R. Ch. 559. Joseph Robson bequeathed and gave to his nephew, Joseph Robson, his old mahogany desk, "with the contents thereof," and made other disposition of his other property. The desk was found to contain notes, bankers' deposit receipts, and unindorsed checks to the order of the testator. The court sustained the gift of the desk with its contents, except the key to a tin box, and adverted upon the disadvantage to men in making bequests of that kind, and then said: "But in this case, as I have said, I think that the words the testator has used are strong enough, and, properly construed, ought to be held to include all the choses in action. The choses in action, if any distinction is to be taken, are such as could have been given by the testator by mere delivery as a *donatio mortis causa*. In that case the indorsement of the executors would be required, and in this

case the indorsement of the executors will also be required.'' This last expression from the court of appeals of England is evidence of the development of the law in that country upon the subject of gifts *causa mortis.* It is only cited as an instance of the growth of the doctrine permitting gifts of choses in action.

Chancellor Kent, about the same time that Lord Eldon decided *Duffield* v. *Elwes,* wrote that the distinction made by Lord Hardwicke between bonds and bills of exchange, promissory notes, and other choses in action, ''seems now to be exploded in this country, and they are all considered proper subjects of a valid donation *causa mortis* as well as *inter vivos.*'' (2 Kent Comm. 448.) One of the earliest explosions was in *Wells* v. *Tucker,* 3 Bin. (Pa.) 366, when, in 1811, it was decided that where a bond was delivered by the donor in his last illness to his wife, for the use of a third person, it was a good *donatio causa mortis.* See, also, 2 Barb. Pers. Prop. p. 632. Shaw, C. J., followed the doctrine of Kent in *Parish* v. *Stone,* 14 Pick. 198, and *Sessions* v. *Mosely,* 4 Cush. 87.

The principle has also been recognized by English text writers.

Williams on Executors says bank notes may be the subject of a *donatio mortis causa,* because the property is transferred by the delivery; and, on the same principles, all negotiable instruments, which require nothing more than delivery to pass to the donee the money secured by them may be the subjects of donations *mortis causa.* (1 Williams Ex'rs p. 829; Rop. Leg. p. 18, and cases cited.)

Story, when he wrote in 1835, doubted the soundness of the doctrine of *Ward* v. *Turner,* to the effect that a promissory note or bill of exchange not payable to bearer, or indorsed in blank, cannot take effect as a *donatio mortis causa,* inasmuch as no property therein could pass by the delivery of the instrument, and boldly said that the doctrine no longer prevails; that, where a delivery will not execute a complete gift *inter vivos,* it cannot create a *donatio mortis causa,* because it would not prevent the property from vesting in the executor;

and as a court of equity will not, *inter vivos*, compel a party to complete his gift, so it will not compel the executor to complete the gift of his testator.    On the contrary, the doctrine now established by the highest authority is that courts of equity do not consider the interest as completely vested in the donee, but treat the delivery of the instrument as creating a trust for the donee to be enforced in equity.    (1 Story Eq. Jur. 604.)

It being clear now that, under the progress of administration of principles of equity, gifts *causa mortis* may be made of incorporeal as well as corporeal chattels, and of choses in action generally, we must examine the class of property in this case,—namely, national bank shares,—and observe whether or not they are to be treated as upon any different plane from that occupied by shares of stock generally.    As will be seen by the statement of the facts, the certificates delivered to Andy were issued in the donor's name, and each certificate contained the words "transferable only by him or his attorney on the books of the bank on the surrender of this certificate."    The by-laws of the bank also required a transfer on the books.    The Revised Statutes of the United States (section 5139) provide as follows:    "The capital stock of each association shall be divided into shares of one hundred dollars each, and be deemed personal property, and transferred on the books of the association in such manner as may be prescribed by the by-laws or articles of association.    Every person becoming a shareholder by such transfer, shall, in proportion to his shares succeed to all the rights and liabilities of the prior holder of such shares."    No writing having passed at all between the parties, donor and donee, and no transfer on the books having been made, we must look at the principles and authorities bearing upon the direct point involved.

It was held in *Slaymaker* v. *Bank*, 10 Pa. St. 373, that shares of stock are, in commercial usages, regarded as choses in action, and the certificates are evidence of the title of the holder to them.    Now, a chose in action is incorporeal and incapable of delivery except by symbol.    We grant that it is

essential to the validity of a gift that it should be executed, but, where the nature of the property given is incapable of manual delivery, a delivery of the symbol which represents it is the only way to execute the gift. Things incorporeal, says Schouler, in a learned review of gifts *causa mortis*, were not contemplated by the earlier English jurists at all, but when, in the commercial world, bills and notes acquired a standing before the courts, "delivery of the writing, with or without indorsement, became the rule of transfer." Equitable assignments are now thoroughly recognized in the law, and, as a consequence, gifts that would have failed long ago in England because of imperfect delivery may be now upheld by the aid of a court of equity. (2 Schouler Pers. Prop. § 72 *et seq.;* Thornt. Gifts § 273 *et seq.*)

In *Grover* v. *Grover* (1837) 24 Pick. 261, it was decided that a valid gift could be made *inter vivos* of a promissory note payable to the order of the donor, without indorsement by him or other writing. The English cases referred to heretofore are cited in the opinion of the court, and Lord Hardwicke's opinions referred to in the following language: "The leading case on this point is that of *Miller* v. *Miller*, 3 P. Wms. 356, in which it was held that the gift of a note, being a mere chose in action, could not take effect as a donation *mortis causa*, because no property therein could pass by delivery, and an action thereon must be sued in the name of the executor. But in *Snellgrove* v. *Baily*, 3 Atk. 214, Lord Hardwicke decided that the gift and delivery over of a bond were good as a donation *causa mortis*, on the ground that an equitable assignment of the bond was sufficient. It seems to be very difficult to reconcile these two cases. The distinction suggested by Lord Hardwicke in the case of *Ward* v. *Turner*, 2 Ves. Sr. 431, in which he adheres to the decision in *Snellgrove* v. *Baily*, is technical, and, to my mind, unsatisfactory, and certainly has no application to our laws, which place bonds and other securities on the same footing. We cannot, therefore, adopt both decisions without manifest inconsistency; and we think for the reasons already stated, that the decision in

*Snellgrove* v. *Baily*, is supported by the better reasons, and is more conformable to general principles and the modern decisions in respect to equitable assignments. We are therefore of the opinion that the gift of the note of hand in question is valid.''

In *Camp's Appeal* (1869) 36 Conn. 88, it was decided that choses in action, the title to which passes by delivery, may be the subject of a gift, as well as any other species of property, and the court said : '' Whatever may be said or thought of the propriety of the law, it is well settled by the modern authorities that choses in action not negotiable, and negotiable paper not indorsed, may be the subject of a gift, and that a delivery which vests in the donee the equitable title is sufficient without a complete transfer of the legal title. In this respect a title by gift is not distinguishable from a title by purchase for a valuable consideration, and, when the claims of creditors do not interfere to affect its validity, such a title will be recognized and protected in the same manner and to the same extent as a title by sale.''

In *Tillinghast* v. *Wheaton* (R. I., 1867) 5 Am. Rep. 621, the delivery of a savings bank pass book containing entries by the officers of the bank of the amounts deposited by a deceased's wife, with a parol gift of the same by her husband on his deathbed, was a good gift *causa mortis* of the money deposited in the bank. The court there said that in the more recent English decisions the strictness of the ancient rule was relaxed, and the gift was sustained. The courts of Kentucky (*Stevenson's Adm'n* v. *King*, 50 Am. Rep. 172) have recently followed the modern doctrine. A Mrs. Stevenson selected John King as her agent, and, when she died, King had in his possession a note and some county bonds, the bonds payable to bearer, and the note indorsed in blank. On the day before Mrs. Stevenson died, she told her mother that she gave her property to her, and she delivered a paper to her mother, telling her that this paper was to show the property she had at Louisville, and to get her money on the paper. The paper was the letter from the agent, King, containing a state-

ment of the property in his possession belonging to Mrs. Stevenson. The contention was in part in that case that, in order to make such a gift of a note or bond, it must be delivered by passing manually from the possession of the one to the other; but the court held that the delivery required "must be according to the nature of the thing, and usually that means according to the physical nature of the thing to be delivered. * * * Now, will it be insisted, under the more modern authorities, that an actual delivery of the chose in action to the donee will not constitute a gift? We think not." The earlier cases are reviewed in this opinion, and the gift of the note and bonds was held to be good.

In *Hill* v. *Stevenson* (1873) 63 Me. 364, a delivery to a donee of a savings bank book, containing entries of deposits to the credit of the donor, with the intent to give the donee the deposits represented by the book, was held to be a good delivery, as vesting an equitable title in the donee without assignment. See, also, *Druke* v. *Heiken*, 61 Cal. 346; *Westerlo* v. *De Witt*, 36 N. Y. 340; 3 Redf. Wills, page 336.

Although some writers of recent date disapprove of the doctrine which sustains gifts *causa mortis* of stock in a bank by mere manual delivery of the certificate, yet there is a recognition that such gifts made are upheld where a complete equitable title vests in the donee, and where the evidence shows that it was plainly the intent of the donor to make the gift. This principle is recognized in *Grover* v. *Grover*, heretofore cited; also, in *Bates* v. *Kempton*, 7 Gray 382, and in the following cases: *Allerton* v. *Lang*, 10 Bosw. 362; *Penfield* v. *Thayer*, 2 E. D. Smith 305; and, indeed, it was thought it was recognized by Lord Hardwicke himself in *Snellgrove* v. *Baily*, criticised in *Grover* v. *Grover*. Pomeroy, after laying down the modern rule that all things in action "which consist of the promises or undertakings of third parties, not the donor himself, of which the legal or equitable title can pass by delivery, may be the subjects of a valid gift," says, in a note: "It is held in England that shares of stock are not capable of being the subject-matter of a valid donation, because no title can be

transferred by delivery; no title can pass except by transfer on the company's own books. Under the law of this country with respect to the title of the assignee before transfer is made in the company's books, there seems to be no reason why a certificate of stock may not be the subject of a valid gift, certainly if it has been indorsed in blank; but in my opinion, such indorsement is not necessary." (3 Pom. Eq. Jur. § 1148; 1 Mor. Priv. Corp. § 197.)

In *Grymes* v. *Hone*, 49 N. Y. 17, the court sustained a gift *causa mortis* of bank stock, where there was no delivery of the certificate, and no transfer on the books, but an assignment in writing of the shares. It was held that delivery of the certificates without a transfer on the books of the bank would have made no more than an equitable title against the bank, but would have given a legal title as against the assignor, and that the representatives of the donor became trustees for the donee by operation of law to make the gift effectual.

In *Walsh* v. *Sexton*, 55 Barb. 251, a woman, apprehending death, gave some certificates of stock in a railroad to her husband. The certificates, on their face, were transferable only by her or her attorney on the books of the company on surrender of the certificates. There was no transfer, and no power of attorney was signed. The gift was sustained upon the authority of *Westerlo* v. *De Witt*, 36 N. Y. 340. *Westerlo* v. *De Witt* (1867) is generally cited, and bears closely upon the case at bar. The donor, apprehending speedy death, told the plaintiff to bring her a roll of paper from the pocket of one of her dresses. She took the roll, and gave it to the plaintiff. There was in the roll a certificate of deposit for $1,500. After the gift, the donee returned the parcel to the pocket of the dress, as directed by the donor before her death. The donor left a last will and testament, in which she bequeathed to the plaintiff the legacy of a thousand dollars and the dress in which the parcel was placed. The plaintiff doubted whether the certificate was intended for her. She was advised that she could not recover it in law. There

were other facts and circumstances not necessary to here re-
capitulate. The court of appeals, by Hunt, J., sustained the
gift, upon the ground that it was quite clear that in apprehen-
sion of death, or among the living, the gift of a mortgage or
an indorsed note may be effected by a simple delivery of the
security, and that Mrs. Clinton did not expect or intend to re-
tain any control over the possession of the money or security
after the date of the delivery. The security was placed upon the
same footing as the money, and both were held to be susceptible
of being presented as a gift by delivery. "It is impossible,"
said the court, "to apply any rule which would make this a
valid gift as to the money, and invalid as to the certificate.
They must stand or fall together."

In *Com.* v. *Crompton*, (1890) 137 Pa. St. 138, 20 Atl. 417,
the donor there delivered a box containing a government bond
and certificates of railroad stock, with the intent to give the
securities to the defendant. The court passed upon the direct
question of whether the failure to make a formal written
transfer would defeat the purpose of the donor. It was treated
as well settled that a valid gift of nonnegotiable securities may
be made by delivery of them to the donee, without assignment
or indorsement in writing; and, to sustain that proposition,
the court cite *Wells* v. *Tucker*, 3 Bin. 366; and *Licey* v. *Licey*,
7 Pa. St. 251. "The shares of stock are choses in action, and
the certificates evidence of the title to them. Why may not
a delivery of certificates, coupled with words of absolute and
present gift, invest the donee with an equitable title to the
stock, which the donor or a volunteer cannot successfully as-
sail? A stockholder may clothe another with the complete
equitable title to his stock, without compliance with the forms
printed by the corporation."

In *Cook* v. *Lum*, 55 N. J. Law 373, 26 Atl. 803, it is
recognized that things in action may be given by a surrender
to the donee of the donor's voucher of right or title, although
the gift was in that case, on the facts, held invalid. So does
Tiedeman on Equity Jurisprudence (section 359) uphold gifts
of choses in action. (Brantl. Pers. Prop. § 208, citing Pome-

roy's opinion in his note.)   Lowell on  Transfers (sections 43
and 109) lays down the rule that "a  certificate is a muniment
of title, and  a  delivery of  the  certificates, like a delivery of
the title deeds in England, may be evidence of  an intention to
transfer the property they represent; and, on the same princi-
ple, the delivery of a certificate of stock may be a good *dona-
tio causa mortis*, although no  transfer of the  stock is exe-
cuted." (*Reed* v. *Copeland*,  50  Conn.  472.)  Promissory
notes, with or without indorsements, if delivered, may be
good gifts *causa mortis*. (Crosw. Ex'rs & Adm'rs § 621;
*Vandor* v. *Roach*, 73 Cal. 614, 15 Pac. 354.)

The delivery of the certificates being intended as a gift of the
stock, the donor did all that was required to pass an ownership,
especially as there was no blank assignment on the back, and no
attorney present to draw one. The authorities above cited per-
mit the circumstances surrounding the actors to be considered.
(*Thomas' Adm'r* v. *Lewis*, (Va.) 15 S. E. 389.)

The view that a delivery of the shares to Andy without writ-
ing or transfer on  the books is good is also in direct harmony
with *Basket* v. *Hassell*, *supra*, where it was regarded as unques-
tionable that a delivery of the  certificate of  deposit involved
therein, to the donee, without an indorsement, would have trans-
ferred the whole title and interest of the donor in the fund repre-
sented by it, and might have been valid as a *donatio causa
mortis*.   And we here observe that, as the doctrine of the su-
preme court in this oft referred to case seems, upon appel-
lant's theory, to contract the common-law definitions of the
character of the conditions attached to a delivery, yet upon
this point—that choses in action may be given *causa mortis*—
we find the same great tribunal that decided that case expand-
ing the original English definitions so as to include not only
choses in action generally, but those which, by delivery, con-
cededly passed but an equitable title against all, except between
the parties themselves.

Thompson, in his Commentaries on Private Corporations,
upholds a gift of stock by a delivery of the certificates, and
cites *Basket* v. *Hassell*, *supra*, to sustain his text, and lays it

down "that, in conformity with this doctrine, it has been often held that a valid gift of nonnegotiable securities may be made by the delivery of them to the donee without an assignment or indorsement in writing. This principle has been applied to notes, bonds, stocks, certificates of deposit, and life insurance policies. * * * So, also, it has been held that a valid gift, in view of death, of corporate stocks, may be made by a simple delivery of the certificates with the intent to transfer the stocks, even though the certificates on their face are made 'transferable only by her or his attorney on surrender of this certificate ' though, as already seen, a gift of shares may be executed by a transfer on the books without a delivery of the certificate." (Section 2390.)

The argument that national bank shares stand upon a different footing is not tenable, for it was held in *Johnson* v. *Laflin*, 103 U. S. 800, that, when a certificate of stock in a national bank was delivered (with a blank power of attorney indorsed) as between the parties thereto, the title to the shares then passed; the right to the shares then vested in the purchaser. "The entry," said the court, "of the transaction on the books of the bank, where stock is sold, is required, not for the translation of the title, but for the protection of the parties dealing with the bank, and to enable it to know who are its stockholders entitled to vote at their meetings, and receiving dividends when declared. * * * Purchasers and creditors, in the absence of other knowledge are only bound to look to the books of registry of the bank. But, as between the parties to a sale, it is enough that the certificate is delivered with authority to the purchaser, or any one he may name to transfer it on the books of the company, and the price is paid." And, again : " The transferability of shares in the national banks is not governed by different rules from those which are ordinarily applied to the transfer of shares in other corporate bodies."

In *McNeil* v. *The Tenth Bank*, 46 N. Y. 325, the delivery of a certificate with the assignment and power indorsed was held to pass the entire title, legal and equitable, in the shares of a na-

tional bank, notwithstanding that, by the terms of the charter or by-laws, the stock was declared transferable only on its books. "Such by-laws," said the court, "do not incapacitate the shareholder from parting with his interest, and that his assignment, not on the books, passes the entire legal title to the stock, subject only to such liens as the corporation may have upon it, and except the right of voting at elections," etc. Judge Thompson, in his usual clear and vigorous style, discusses the doctrine of distinguishing between the legal and equitable ownership of stock where the delivery of the certificate is had, and approves that part of the opinion of Judge Rapallo in the case last cited, and concludes with the following observations of his own : "So, the legal owner of shares in a corporation is the owner in whose name the shares stand on the books of the corporation; whereas the equitable owner is the one who, being the beneficiary,—that is, the real owner,—is not registered as such on the corporate books, and who must, if the corporation refuses so to register him, go into a court of equity to compel them to do so. The real meaning is that his title is complete as against everybody but the corporation itself, and those who have a superior right to have the corporation make the transfer to them." (Thomp. Corp., § 2393.)

We are therefore of opinion that it was not indispensable to the validity of the transfer of the stock in question, by our statutes or the law generally, that there should have been any writing on the backs of the certificates, and that an equitable title passed to Andy. This equitable title gave Andy full right to the stock, and equity should afford him the means of obtaining the possession of that incorporeal subject of gift,—stock itself. The intent having existed in Judge Davis' mind to make the gift, and the stock certificates having been delivered, the legal title was complete as between Andy and his uncle, subject always, of course, to revocation or to the inherent conditions in gifts *causa mortis*. We need not consider the attitude of third parties or creditors, because none have appeared in this case. The donee, therefore, having an equitable title and a legal right, may enforce that right by the aid of equity.

Many of the cases heretofore cited are where courts have extended their aid to give effect to gifts *causa mortis.* (1 Story, Eq. Jur. 607 *et seq.*)

Passing to the point of dominion and control, the authorities hold, without much conflict, in recent decisions, that the delivery of a chose in action as a gift must be such as to vest in the donee the equitable title, and to divest the donor of all present control and dominion, always, of course, upon the recognized condition in cases of a gift *causa mortis*; and that a delivery which does not confer upon the donee the present right to reduce the fund into possession, by enforcing the obligation, according to its terms, will not suffice. As we have seen, the intent of Judge Davis was complete in this case, and the delivery passed to the donee the equitable title. Thus did the gift possess the all-important qualities of depriving the donor of all control and dominion over the property; and thus was the right conferred upon Andy to have compelled a transfer on the books of the bank of the stock to him. Under our view of the testimony of the words spoken by Judge Davis subsequent to the gift, it is unnecessary to discuss whether or not there was any limitation or suspension of this right conferred upon Andy by the donor, although, as said, even upon appellant's theory, we doubt if there was other than the law implies in all gifts *causa mortis.* No writing was necessary, as said before, to perfect the delivery, and the omission of this ceremony does not lead to the conclusion that the transaction is invalidated, on the ground that, by its omission, the donor was deprived of the control and dominion. The donor had parted, and intended to part, with the muniments of title to the shares in the bank, and thus surrendered the certificates which were necessary to obtain a transfer on the books of the bank.

Did Judge Davis, however, exercise any dominion and control after the date of the gift? The facts and circumstances, as apparent by the statement preceding this opinion, show that his nephew voted 950 shares of stock for the decedent for director, at the regular stockholders'

meeting, January 14, 1890. The holder of this proxy never conversed with Judge Davis regarding the same. It was given to the holder by Andy, and the facts all go to show that from the time Judge Davis executed the proxy, which antedated the gift some three days, he never was at the bank or took any part in its management or affairs. At the time of the meeting, he was sick and away. Andy controlled the proxy entirely. It was necessary to hold the bank meeting, and, to do this, the stock in question had to be voted. As against the bank itself, the legal title to the stock was in Judge Davis, for by its books was it alone guided. Andy produced the proxy, and inserted his brother's name; and at the direction of Andy, as said before, the stock was voted. We cannot see how this proxy can be made to defeat the donor's intent, as evidenced by the words and delivery and surrender of the certificates to Andy after the date of the proxy. Possibly, when the proxy was signed by Judge Davis, he had not made up his mind exactly what to do, or he might have contemplated postponing the execution of this gift; but it would be most unjust to hold that an act done under that proxy, without his knowledge or consent, should nullify all his acts and words sanely done just before he went to Tacoma. And, so far as Andy is concerned, he only did what any layman under such circumstances would have done; that is, assist to confer upon his dying uncle, during the rest of his life, the highest mark of affectionate regard then within his power to bestow.

It has taken centuries for the most experienced and wise judges to determine that a donor of a gift *causa mortis* must divest himself, at the time of the gift, of all dominion and control of the article donated, and must place it wholly under the donee's power, and enable him, without further act on his (the donor's) part, to reduce it to his own manual possession; yet it is strenuously urged by the appellant in this case that because Andy did this one single act, made necessary, within a few weeks' after his uncle's departure, it should be construed as so inconsistent with the surrender and control of the stock by his uncle, and of his own right of dominion and control

over the same, as to deprive him of all his rights. It was the dominion of the donee which controlled the voting of the shares. Every presumption is that the donee accepted such a gift, and we cannot believe for a moment that this conduct of Andy at that bank meeting ought to overcome that presumption, when considered in relation with the intent of his uncle, and the delivery of the evidence of the shares to him.

We have not considered Judge Knowles' testimony at the various points throughout this opinion where it might have been pertinent to do so. This omission, however, was due to our desire to avoid needless repetition, for we have regarded it in its application to the whole case. Without repeating it here, we find nothing in the interview between Judge Davis and Judge Knowles, about February 1st, which is not susceptible of reasonable interpretation favorable to Andy. Judge Knowles was not to return to see Judge Davis three days after his first visit with a view to make any testamentary disposition to Andy, for Judge Knowles expressly says that he was not to return "to fix up these gifts exactly," meaning thereby the gifts to Mrs. Wehrspaun's daughter, and the Butte Library, and a lady, and two persons in the states. Judge Davis did not ask Judge Knowles about a will, and only referred to these particular gifts as gifts. He did say that Andy "is to control the bank, or have the bank," or both, which language is surely not unfavorable to the respondent in this case; and, indeed, there is reason in the argument that Judge Davis knew that he had given the stock to Andy, and, by his words, that he meant to exclude it from his estate proper. In doing so, he was but carrying out an intent he had expressed to that effect, long before, to many persons. That the testimony of these prior declarations was admissible is well sustained in reason and in decision. (*Moyer's Appeal*, 77 Pa. St. 486; Thornt. Gifts, §§ 222, 234.)

The length of this opinion prevents any more extended notices of the many cases cited by the appellant which have upheld contrary views of the law. Many of them turned upon the peculiar facts incident to the words of the gift; others are

of a date when systems of commercial transactions between men were far less practical and convenient than in later years; while some adhere to the more ancient common-law doctrines which refuse to recognize gifts *causa mortis* of shares until transfer is made on the books. The early Maryland decisions fully sustain appellant's position that a written transfer is necessary. Those cited to us, and others, are collated in Hinkley's Testamentary Law of Maryland (page 146 *et seq.*) The recent decisions of that state proceed upon *stare decisis*.

The court is asked to pass upon the "federal question" involved in this case. To us it appears, however, that the main point involved is whether there has been a valid gift *causa mortis*. It being clear to us that the equitable title to the stock passed by the delivery of the certificates, no decision has been made upon that point other than by the common law generally; for we do not think the statutes of the United States attempt to regulate the transfer of such an equitable title. But, if there is a federal question raised, it is this: Can an interest in the shares of a national bank be legally transferred by the owner thereof to a donee, as a gift *causa mortis*, so as to confer the equitable title upon the donee, without a written transfer of the shares on the books of the bank, or an indorsement on the backs of the certificates themselves? We answer that question affirmatively, in the light of the decisions of the supreme court of the United States, that a transfer on the books of a national bank is not necessary to give to a donee or purchaser an equitable title to the shares. (*National Bank* v. *Watsontown Bank*, 105 U. S. 220; *Bank* v. *Lanier*, 11 Wall. 378; *Johnston* v. *Laflin*, 103 U. S. 804; *Black* v. *Zackarie*, 3 How. 513.) Judge Brewer, as circuit judge, held in *Kansas* v. *Bradley*, 26 Fed. 289, that a proposition once decided by the supreme court of the United States is no longer to be treated as a federal question. Nor do questions which involve the ownership of national bank shares always present federal questions. (*Williams* v. *Weaver*, 100 U. S. 547; *Le Sassier* v. *Kennedy*, 123 U. S. 521, 8 Sup. Ct. 244.)

We see no error in admitting the testimony of John E. Davis. The defendant had the burden of proof upon him; and, as the legal title stood in the name of the decedent, it was proper to show that respondent controlled and directed the voting of the stock, although it was voted and stood in the decedent's name. Having been rejected as a witness himself, he was obliged to produce some proof to explain who exercised dominion in fact, and to rebut a presumption which might otherwise have arisen against him by the records of the bank meeting.

The testimony of Darnold, if entirely credible, would have rendered this case much simpler for discussion. We cannot tell what weight the district court gave to it. It is plausible and consistent in itself, and may have impressed the court as truthful. But we have considered its value as impaired by the omission of Darnold to deny Boyce's affidavits by counter affidavit. We regard Boyce's testimony on the trial as not weakening Darnold's statements. On the contrary, a reason for believing that Darnold told the truth is that Boyce failed to produce his books, which were at his house, he says, and thus to verify his statement that Darnold did not leave his (Boyce's) employ until some time after the alleged interview with Judge Davis, in 1890. It was to appellant's interest to impeach Darnold, and Boyce was called for that purpose. To know whether Darnold was in search of employment when he says he called upon Judge Davis was of the highest importance from the standpoint of impeachment, but upon that point appellant wholly failed, although Boyce said he had the evidence in his own possession. Moreover, if the affidavit of respondent Davis is true, Boyce was using Darnold's alleged statement of former perjury to coerce respondent into participation in a scheme to get money from the estate to pay Boyce's debts. Such a proposition, if it were really made, unfolds a brief chapter of moral obliquity on Boyce's part, well calculated to shake the truth of his entire affidavit.

There is nothing whatsoever in the motion for a new trial to show that Darnold would testify differently from the way he

did, even if we assume that what he said upon the preceding trial was false. The rule is not to grant a new trial to get impeaching testimony. A prosecution for perjury would be appropriate. (*Hopcraft* v. *Kittredge* (Mass.), 37 N. E. 768.) The same evidence produced on this trial, if the testimony of Darnold were excluded, would be abundantly sufficient to sustain the conclusion reached by the district court; and courts will not grant new trials where it is apparent from the record that the result would probably be the same. (*United States* v. *Biena* (N. M.), 42 Pac. 70.)

The findings made cover the issues involved in the pleadings, and are supported by the evidence.

Our conclusion is that this gift must be sustained. We believe in adhering to the rule that, where a party claims by way of a donation *causa mortis*, he should make out a strong case. It is therefore the duty of the court to give particular heed to every fact and circumstance in the testimony, being very careful to avoid any conclusion not fully sustained by credible evidence. On the other hand, there is a cardinal principle never to be lost sight of, namely, that the law permits a man to make gifts in apprehension of his death; and if he has done so in due manner, while in full possession of his senses, and with deliberation and intent to bestow his personal property upon another, it would be a fearful injustice to nullify that intent, and take away the property from the person justly entitled thereto.

The more we have studied this case, the stronger has grown our conclusion that Judge Davis deliberately gave the bank stock to his nephew, and never, by any word or deed, signified any desire whatsoever to revoke the gift. We can find no middle line to follow in applying the rule of equity to the facts. Either the gift was perfected as between the judge and Andy, and must be sustained, or the entire case of respondent Andy Davis is conceived in an iniquitous conspiracy with the appellant to enrich himself at the expense of his dead uncle's estate. If there were a conspiracy, the very foundation of it must needs lie in the premise that Judge Davis never handed over

to the respondent any certificates of the shares at all before he went to Tacoma. But the premise that he did deliver the certificates is not assailed by any one throughout this case, and, under the testimony, could not be considered for a moment. So that, when the assumed premise is removed, the whole hypothesis of dishonesty falls with it, and leaves standing by itself, as the correct reasoning and conclusion of the case, the gift of this fortune, which equity will uphold and enforce, as prayed for by the respondent. The judgment is affirmed.

*Affirmed.*

PEMBERTON, C. J., and DE WITT, J., concur.

PER CURIAM.—The record in this case was made up entirely with Talbott, as special administrator, as plaintiff, and the briefs so treat him. For that reason he has been called "plaintiff." At the argument of the case, by consent of counsel, John H. Leyson was substituted as plaintiff; Leyson having been appointed as administrator since the appeal in this case was taken.